[Crim. No. 18335. In Bank. July 16, 1975.]

In re RICHARD M., a Minor, on Habeas Corpus.

**COUNSEL**

Roberta Ranstrom and Loren Mitchell for Petitioner.

Carolyn L. Kemmler for Respondent.

Gertrude D. Chern as Amicus Curiae on behalf of Respondent.

**OPINION**

**SULLIVAN, J.**—In this proceeding petitioner Dolores L. seeks by writ of habeas corpus to have her four-year-old son, Richard M., returned to

her custody. Petitioner alleges that Richard M. is an illegitimate unmarried minor, that she is entitled to exclusive custody and control of him, that he resided with her until October 31, 1973, at which time respondent Jesse H., the child's natural father, wrongfully detained him, and that Jesse H. continues to restrain the child unlawfully and against petitioner's wishes.

In his return to the order to show cause issued in this proceeding, respondent alleges that he retains custody of the minor pursuant to a valid and subsisting order of the Sacramento County Superior Court awarding him permanent custody of the child, that said order was entered after an evidentiary hearing at which the superior court determined that he had legitimated Richard M. and further found that the child's best interests required an award of custody to the father, that said order is res judicata as to the factual issues tendered, tried and decided, and that no errors of law were made by the superior court in issuing its order.

On November 9, 1973, and prior to the instant proceedings, petitioner (hereafter mother) filed a similar petition for a writ of habeas corpus in the Sacramento County Superior Court. On November 12, 1973, that court issued a writ commanding respondent (hereafter father) to appear with the minor. In his return to the writ of habeas corpus, the father alleged that he had legitimated Richard M. pursuant to Civil Code section 230,[1] and requested that he and his wife be awarded custody of the child.

An evidentiary hearing was held which disclosed the following facts. Richard M. was born on July 18, 1969, the illegitimate son of Dolores L. and Jesse H. The mother and father were not then, nor have they ever been, married. However, the father immediately acknowledged that the child was his and continued to do so thereafter.[2] At that time he was not living with Dolores L. but in his own home where his mother (the child's grandmother) also resided.

---

[1]Section 230 provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."
Hereafter, unless otherwise indicated, all section references are to the Civil Code.

[2]Before the child was born, Jesse H., upon learning of Dolores L.'s pregnancy, apparently expressed some doubt that he was the father. However, after Dolores L. affirmed that the child was his, he willingly and openly acknowledged paternity.

When the mother and child were released from the hospital, the father brought them to his house, and they remained there for about a month. The paternal grandmother was aware that the infant was her grandchild, and during this period she and the father helped to take care of the child. Subsequently, the mother returned with the boy to her own home, where she resided with her three other children.

Thereafter with the mother's full knowledge and consent, the father saw him frequently, both at the mother's home and at his own, where the boy often spent weekends. At the age of four months, he was baptized as the child of Dolores L. and Jesse H. in a church ceremony at which the father's brother and sister were named as godparents.

On November 20, 1971, the father married. The child visited him more frequently and for longer periods of time. As a rule, his wife would pick up the boy every other week and bring him to his father's home for three to four days at a time. On several occasions these visits were for longer periods.

Despite his apparent financial ability to do so, the father made no payments to the mother for the boy's support. She relied upon state welfare benefits to maintain her family. However, the father did assume full financial responsibility during the time that the child was in his custody, and at these times bought him clothing, food, medicine and toys.

After one of these visits in October 1973 the father and his wife failed to return the boy to the mother's home. Disturbed by the mother's apparent neglect of the child, the couple decided to attempt to obtain permanent custody. As a result, the mother commenced proceedings in the superior court to have the boy returned to her.

At the close of the evidentiary hearing, the superior court specifically found that the father had publicly acknowledged the boy as his own, had received the child into his family both before and after his marriage, with the consent of his wife as well as of the child's paternal grandmother, and had otherwise treated the child as legitimate. On this basis, the court determined that the father had legitimated the boy pursuant to section 230 and therefore had custody rights equal to those of the other parent.

The court referred the case to the office of the county marriage counselor for preparation of a report on the issue of custody and ordered that pending the report the child remain in his father's custody. On January 21, 1974, the court, after considering the recommendation of the report in favor of the father, concluded that the best interests of the child required an award of permanent custody to the father, subject to the mother's reasonable visitation rights. The court made its order accordingly.

The mother thereupon sought a writ of habeas corpus in the Court of Appeal, making the same allegations as she had asserted in the superior court proceedings. The Court of Appeal issued an order to show cause, a writ of habeas corpus ordering the father to deliver custody of the child to his mother and finally an auxiliary writ of prohibition restraining the superior court from enforcing its order. We granted a hearing.

I

We first dispose of a preliminary matter. Since the trial court made factual determinations in the earlier habeas corpus proceedings, we must decide to what, if any, extent we are bound by them in the proceedings now before us. As we have apparently never spoken on this question, we proceed to describe in some detail the treatment given it by our Courts of Appeal.

■ It is well settled that a person entitled to the physical custody of a child may enforce his right thereto as against one wrongfully withholding the child by a petition for writ of habeas corpus. (*Ferreira* v. *Ferreira* (1973) 9 Cal.3d 824, 834 [109 Cal.Rptr. 80, 512 P.2d 304]; *In re Croze* (1956) 145 Cal.App.2d 492, 495 [302 P.2d 595].) Appellate as well as superior courts have jurisdiction to issue such a writ (Cal. Const., art. VI, § 10), although where factual questions are involved, a petitioner should generally seek relief first in the superior court. (*In re Wren* (1957) 48 Cal.2d 159, 165 [308 P.2d 329].)

■ If the petitioner pursues this course and the superior court denies the writ, its decision is nonappealable.[3] (*In re Bruegger* (1928) 204 Cal. 169, 170 [267 P. 101].) However, the petitioner may seek the same relief by instituting habeas corpus proceedings in the appellate court. *(Id.)* The new proceeding is not a review of the superior court determination; nor

---

[3]A final order of the superior court granting a writ of habeas corpus in a child custody case is made appealable by Penal Code section 1507, enacted in 1959.

are the doctrines of res judicata or collateral estoppel applicable to preclude reassertion of arguments rejected in the prior proceeding. *(Id.)*

Nevertheless, appellate courts have long recognized that where habeas corpus is used to assert custody rights, rather than to secure relief from confinement resulting from criminal prosecution, " 'both principle and considerations of public policy require' " that the superior court's determination of the issues be given some weight. *(In re Holt* (1917) 34 Cal.App. 290, 292 [167 P. 184], quoting from *State* v. *Bechdel* (1887) 37 Minn. 360, 361 [34 N.W. 334, 335]; see also *In re Bruegger, supra,* 204 Cal. 169, 171; *In re Martin* (1947) 79 Cal.App.2d 584, 586 [180 P.2d 383].) The reason for this distinction is the fundamentally civil nature of habeas corpus proceedings when used to determine custody rights. In such proceedings " 'the gist of this charge is not that the child is unlawfully deprived of its liberty, but that such restraint is in prejudice of the right of the relators to its custody. The case is really one of private parties contesting private rights, under the form of proceedings on *habeas corpus.*' " *(In re Holt, supra,* 34 Cal.App. 290, 292; original italics.)

Courts first applying this principle relied upon the doctrine of res judicata and refused to allow a petitioner who was unsuccessful in the superior court to maintain a subsequent proceeding of the same nature in the Court of Appeal absent an allegation of change in circumstances. (See, e.g., *In re Stratton* (1933) 133 Cal.App. 738, 740 [24 P.2d 832]; *In re Gury* (1930) 103 Cal.App. 738, 740 [284 P. 944]; *In re Beers* (1929) 100 Cal.App. 796 [280 P. 1033]; *In re McDaniel* (1928) 90 Cal.App. 307, 310; [265 P. 884]; *In re Gille* (1924) 65 Cal.App. 617, 620 [224 P. 784]; *In re Frazier* (1920) 50 Cal.App. 45, 47 [194 P. 510]; *In re Holt, supra,* 34 Cal.App. 290, 292; see also 24 Cal.Jur.2d, Habeas Corpus, § 54, pp. 504-505.) However, it soon became apparent that the strict application of this doctrine so as to preclude the reassertion of custody rights at the appellate court level could lead to harsh and unjust results where the superior court's determination was erroneous as a matter of law. Since an order denying an application for writ of habeas corpus is not appealable, the unsuccessful petitioner would be wrongfully deprived of custody until such time as he could allege a change in circumstances.

For this reason, appellate courts recognized an exception to the general rule giving full res judicata effect to a superior court order and held "that the order denying the writ is not res judicata in the broad sense that it bars further proceedings for the custody of the child, but in the very narrow sense that a petitioner for a writ of habeas corpus

cannot, in the District Court of Appeal, again litigate the issues of fact decided in the superior court unless after the hearing in the superior court there is a change of the circumstances which affect the right to custody; nor does a decision by the superior court, which constitutes merely a decision of a question of law rather than a fact, bar the petitioner from presenting that same question of law to the District Court of Appeal upon an application for a writ of habeas corpus filed in that court." (*In re Croze, supra,* 145 Cal.App.2d 492, 495; see also, *In re Browning* (1950) 99 Cal.App.2d 337, 338 [221 P.2d 736]; *In re Martin, supra,* 79 Cal.App.2d 584, 586; *In re White* (1942) 49 Cal.App.2d 160, 161 [121 P.2d 100]; *In re Livingston* (1930) 108 Cal.App. 716, 718-719 [292 P. 285].)

Included within this category of questions of law is the determination of whether there is substantial evidence to support the trial court's findings of fact. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 209, p. 4200; *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Estate of Baird* (1924) 193 Cal. 225, 236 [223 P. 974].)

· This appellate court policy of according limited effect to prior superior court determinations is an excellent accommodation of the interest of the petitioner in securing a proper resolution of the legal issues tendered, the interest of respondent in avoiding the harassment of multiple hearings on identical factual issues and the interest of the state in judicial economy. It gives the trial court primary responsibility in the performance of the task for which it is best equipped—namely, the resolution of questions of fact—and narrows the function of the appellate court to that of final arbiter of questions of law. Following this procedure, we limit ourselves in the instant case to reviewing alleged errors of law in the superior court determinations.

## II

We turn to the merits. In seeking habeas corpus relief in this court, the mother contends that the trial court erred in finding that the father legitimated his son pursuant to section 230. In particular, she asserts first that the father never received the boy into his family, as required by statute, since she never consented to relinquish custody of the child to him. She claims that the mother's consent and relinquishment of custody are conditions precedent to legitimation by the father under section 230. Furthermore, she argues, the father did not satisfy the statutory

requirement that he otherwise treat the boy as a legitimate child since he failed to make payments to her in support of his son, although financially able to do so. Having thereby established the boy's illegitimate status, the mother asserts that under California law she has the sole and exclusive right to custody of the child, the father having absolutely no parental rights.[4] On this basis she claims that the trial court erred in awarding custody to the father, even though such award was based upon a proper consideration of the boy's best interests and, supported by substantial evidence, would be immune from attack if the child were legitimate. Finally, she contends that section 230 may not be used to deprive the mother of an illegitimate offspring of its custody if she does not voluntarily relinquish the child.

In support of the superior court's order, the father points out that the determination of whether a father's conduct is sufficient to legitimate his child under section 230 is a question of fact. (*Estate of Baird, supra,* 193 Cal. 225, 236; *Estate of Jones* (1913) 166 Cal. 108, 116 [135 P. 288]; *Estate of Gird* (1910) 157 Cal. 534, 544 [108 P. 499]; *Estate of Maxey* (1967) 257 Cal.App.2d 391, 397-398 [64 Cal.Rptr. 837].) Additionally, he argues, in the case at bench the superior court's finding that he satisfied the statutory requirements and thereby legitimated the boy is supported by substantial evidence. Therefore, he contends that we are bound by this determination in the instant proceedings. (*In re Croze, supra,* 145 Cal.App.2d 492, 495.) Since the mother does not contest the trial court's finding with respect to the boy's best interests, the father asserts that we must deny petitioner the relief requested.[5] Finally, the father urges that the mother's proposed interpretation of section 230, which would preclude its use in giving him custody rights equal to those of other parents, violates state and federal constitutional guarantees of equal protection.

We initially consider the question of whether the father's conduct with respect to his son was sufficient to legitimate the child pursuant to section 230. Under this statutory provision, the natural father of an illegitimate child may legitimate his offspring by publicly acknowledging the child as

---

[4] In making this argument, the mother relies upon section 200, which provides that "[t]he mother of an illegitimate unmarried minor is entitled to its custody, services, and earnings," and upon the decisional law interpreting this section.

[5] In the case of a legitimate minor, section 197 gives both parents equal custody rights. Furthermore, section 4600, subdivision (a), provides that custody is to be awarded "[t]o either parent according to the best interests of the child." Thus, if the trial court's determination that the father legitimated the child is correct, its award of custody to the father must be upheld.

his own, receiving it into his family (with the consent of his wife if he is married), and otherwise treating it as if it were legitimate. (See fn. 1, *ante.*) Legitimation by the father changes the status of the child to that of a legitimate offspring. (§ 230.) Thereafter, the rights and obligations of both child and parent are the same as if the child had been born legitimate. (*In re Navarro* (1946) 77 Cal.App.2d 500, 505 [175 P.2d 896].)[6]

Because of the stigma and unfavorable legal treatment that attends classification of a child as illegitimate, California courts have almost consistently held that section 230 must be liberally construed in favor of finding legitimation.[7] (*Guardianship of Smith* (1954) 42 Cal.2d 91, 94 [265 P.2d 888, 37 A.L.R.2d 867]; *Estate of Lund, supra,* 26 Cal.2d 472, 481; *Blythe* v. *Ayres, supra,* 96 Cal. 532, 575; *Estate of Maxey, supra,* 257 Cal.App.2d 391, 396.) ■ However, in every case in which legitimation under section 230 is an issue, the party asserting that the statutory requirements were satisfied bears the burden of proving five elements: (1) illegitimacy, (2) paternity, (3) public acknowledgement, (4) reception into the family, and (5) treatment as legitimate. (*Estate of Flood* (1933) 217 Cal. 763, 767 [21 P.2d 579].)

In the instant case, it is undisputed that the child was born illegitimate, that Jesse H. is the father and that he has publicly acknowledged his paternity. The only contested matters are whether the father received the boy into his family and whether he otherwise treated him as legitimate within the meaning of the statute.

The question of whether a natural father has "received the child into his family" is perhaps the most frequently litigated issue in cases involving section 230 legitimation. While numerous courts have attempt-

---

[6]Although the statute provides that a father who satisfies the specified requirements thereby "adopts" the child, the word "adopts" as used in section 230 has been construed to mean "legitimates," so that " 'the acts of the father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than in its adoption.' " (*Estate of Lund* (1945) 26 Cal.2d 472, 492 [159 P.2d 643, 162 A.L.R. 606], quoting from *Blythe* v. *Ayres* (1892) 96 Cal. 532, 559 [31 P. 915]; see also, *In re Navarro, supra,* 77 Cal.App.2d 500, 503.)

[7]Virtually the only cases in which the policy of the law favoring legitimation has not been held to require liberal construction of this statute have been those in which the child will achieve the status of legitimate regardless of the court's decision on the section 230 question (*Adoption of Graham* (1962) 58 Cal.2d 899, 904 [27 Cal.Rptr. 163, 377 P.2d 275]), as for example, in cases in which the natural father seeks to prevent the adoption of the child by third parties. (See, e.g., *Guardianship of Truschke* (1965) 237 Cal.App.2d 75, 78 [46 Cal.Rptr. 601]; *Adoption of Irby* (1964) 226 Cal.App.2d 238, 240 [37 Cal.Rptr. 879].)

ed to give meaning to this concept, no single satisfactory definition of this phrase has been fashioned. However, several general principles emerge from the decisional law in this area.

First of all, the term "family" as used in section 230 has been very broadly defined and is by no means restricted to the traditional notion of a husband, wife and children, or even close blood relatives of the father. Rather, the statute at most requires that the father "have a 'home,' a settled place of habitation of which he is the head, into which he. . . . receive[s] the child . . . ."[8] (*Estate of Gird, supra,* 157 Cal. 534, 545; see also *Estate of Baird, supra,* 193 Cal. 225, 278-279; *Adoption of Pierce* (1971) 15 Cal.App.3d 244, 249 [93 Cal.Rptr. 171].) Thus, "where the father of an illegitimate child lives in a home alone, such home may constitute a 'family' into which he may receive the child, or where the father and mother of an illegitimate child live in a home or habitation of which the former is the head, although they are not married, the father has a 'family' within the meaning of section 230, into which the illegitimate child may be received. [Citations.]" (*Estate of Baird, supra,* at p. 279; see also *Adoption of Pierce, supra,* at p. 250; *Hurst* v. *Hurst, supra,* 227 Cal.App.2d 859, 870; *Lavell* v. *Adoption Institute* (1960) 185 Cal.App.2d 557, 561-562 [8 Cal.Rptr. 367].)

California courts have generally adopted an equally liberal interpretation of the concept of "receiving" as used in the statute. This requirement is satisfied by evidence that the father accepted the child as his own, usually demonstrated by an actual physical acceptance of the child into the father's home to the extent possible under the particular circumstances of the case. Thus the father receives the child into his family when he temporarily resides with the mother and child, even for a very brief period. (*Hurst* v. *Hurst, supra,* 227 Cal.App.2d at p. 870; *Serway* v. *Galentine* (1946) 75 Cal.App.2d 86, 91 [170 P.2d 32].) In *Hurst, supra,* the father rented an apartment for two months in the names of the child's mother and the child, as well as in his own name. The court held that this conduct satisfied the statutory mandate, although the father himself was never physically present in the apartment. (*Id.,* at p. 870.) Similarly, a father was found to have accomplished "prenatal legitimation" under section 230 by living with the child's mother for a two-year period prior to the child's birth. (*Lavell* v. *Adoption Institute, supra,* 185 Cal.App.2d at pp. 559-562.) In so holding, the court was not deterred by

---

[8]At least one court has held that the father's place of habitation need not be "settled" in order to satisfy the statutory requirement. (See *Hurst* v. *Hurst* (1964) 227 Cal.App.2d 859, 870 [39 Cal.Rptr. 162, 19 A.L.R.3d 635].)

the fact that the mother left the father's home before the child was born, refused to marry the father, and relinquished the child for adoption immediately after birth. (*Id.,* at pp. 558-559; see also *Estate of Abate* (1958) 166 Cal.App.2d 282, 286-287 [333 P.2d 200].)

The statutory receipt requirement is also fulfilled by the father's acceptance of the child into his home for occasional temporary visits. In *Estate of Peterson* (1963) 214 Cal.App.2d 258 [29 Cal.Rptr. 384], these visits consisted of one brief encounter and two weekends which the daughter spent at the home of her father and his wife. (*Id.,* at pp. 263-264.) The visits found to be adequate in *Estate of Wilson* (1958) 164 Cal.App.2d 385 [330 P.2d 452], while more frequent than those in *Peterson,* were far shorter, the longest continuing from noon to dusk. (*Id.,* at p. 387.) In *Estate of Jones, supra,* 166 Cal. 108, this court found the statutory requirement satisfied when a child spent two months at his father's ranch recuperating from an illness, even though the boy was accompanied on this trip by his mother, her husband and their child. (*Id.,* at p. 115.)

Nor have the courts been strict in insisting that the child be actually physically present in the father's home; a constructive reception may suffice.[9] In *Estate of Maxey, supra,* 257 Cal.App.2d 391, for example, the father's conduct constituting receipt of his son into his family consisted of seeing the child at the mother's house. The boy apparently visited his father's apartment on only one occasion, at which time he was addressed as "son" in the presence of other people. (*Id.,* at p. 395.)

■ Applying these principles in the instant case, we find ample evidence in the record to support the trial court's finding that the father received the child into his family for purposes of section 230, both before and after his marriage. It is undisputed that the mother and the child resided with the father for two weeks to one month after the boy was born. During this time the father and the boy's paternal grandmother helped care for the infant. Thereafter, the child generally spent every other weekend at his father's home. Subsequent to the father's marriage, these visits were apparently extended to three or four days, and

---

[9]It is unnecessary for us to here consider the extent to which courts have expanded the concept of "receiving." *Blythe v. Ayres, supra,* 96 Cal. 532, probably goes the farthest in liberally construing this requirement, since the father was found to have satisfied the statutory mandate without ever actually seeing the child. It is noteworthy that this determination was subsequently criticized by this court in *Estate of De Laveaga* (1904) 142 Cal. 158, 169-170 [75 P. 790].

occasionally continued for longer periods of time. Not only did the father's wife consent to receive the child into their home, but she picked up the boy for most of his visits. In light of these facts, we find that the father's conduct was more than adequate to demonstrate his acceptance of the boy as his own to the extent possible under the circumstances and therefore clearly fulfilled this statutory requirement.

■ We are not persuaded by the mother's argument that her consent and voluntary relinquishment of custody were conditions precedent to the boy's reception into his father's family. This interpretation of the requirement of section 230 finds no support in the language of the statute, conflicts with the overwhelming weight of authority and is against public policy.

Examining the language of the statute, we note that it does not mention the natural mother, does not require her consent, and does not indicate that the father must acquire custody of the child. Nor do we find any basis for imposing this added burden upon the father's ability to legitimate his offspring, particularly in light of public policy favoring legitimation. (*Estate of Lund, supra,* 26 Cal.2d at p. 481; *Blythe* v. *Ayres, supra,* 96 Cal. at p. 575.)

It is on these grounds that the great majority of courts which have considered this question have refused to adopt such a narrow definition of the term "receiving."[10] In expressly rejecting this construction, the court in *Estate of Peterson, supra,* 214 Cal.App.2d 258, stated: "To require respondent [the child], as a condition of legitimation, to leave her own family and take up residence with her father for a prolonged period of time would serve no useful purpose whatever, and would defeat the liberal interpretation which the courts have always accorded section 230. [Citations.] . . . In any event, it is well settled that it was never the intent of the Legislature to impose such a requirement, even in those cases, involving minor children." (*Id.,* at p. 263.)

Those authorities which purport to define the universally accepted interpretation of this phrase in states having such a statute declare that "the consent of the mother of the illegitimate is not a necessary element of the legitimation in this manner. [Fn. omitted.]" (10 Am.Jur.2d, Bastards, § 53, p. 882; see also Annot., Bastards—Recognition—What

---

[10]See discussion of cases interpreting this requirement in the text accompanying footnote 8, *ante.*

Constitutes, 33 A.L.R.2d 705, 742; 10 C.J.S., Bastards, § 11, p. 56.)[11] In addition, they state that the "reception" into the father's family need not be indefinite or continuous. Rather, the requirement is satisfied by "an actual physical acceptance of the child into . . . [the father's home] for a short duration. [Fn. omitted.] And even where no home exists, . . . courts have also recognized a constructive reception into the family, as by public and proud acknowledgements of paternity. [Fn. omitted.]" (10 Am.Jur.2d, Bastards, § 55, p. 884; see also Annot., Bastards—Recognition—What Constitutes, 33 A.L.R.2d 705, 749; 10 C.J.S., Bastards, § 11, p. 58; *In re Buffington's Estate* (1934) 169 Okla. 487 [38 P.2d 22, 25-26].)

In maintaining her position, the mother relies upon four California cases which contain language supportive of the interpretation she proposes. However, an analysis of the facts of these cases indicates that her reliance on them is misplaced. *Adoption of Irby, supra,* 226 Cal.App.2d 238, and *Guardianship of Truschke, supra,* 237 Cal.App.2d 75, both involved situations in which the mother, because of her exclusive right to custody (§ 200), was able to prevent the father from establishing *any* relationship with the child, much less physically receive it into his family. On this basis, the courts concluded that the children had not been legitimated. In the case at bench, it is undisputed that the child spent a great deal of time in his father's home, and that at all times after the child's birth their father-son relationship was recognized by all.

In *Cheryl H.* v. *Superior Court* (1974) 41 Cal.App.3d 273 [115 Cal.Rptr. 849], the child had not yet been born at the time the father brought suit asserting custody rights and seeking to restrain the mother from relinquishing the child to an adoption agency. The father admittedly had not legitimated the child at the time he commenced the action. In denying the relief requested, the court simply held that at that particular time the father could not establish custody rights in the child. (*Id.,* at pp. 279-280.) However, the court left open the question of whether the father would eventually be able to prevent adoption of the child by a nonparent and obtain custody for himself. (*Id.,* at p. 280.)

The mother directs our attention to the one case with facts similar to those at bar, in which the court found that the legitimation statute had not been satisfied. In *Adoption of Pierce, supra,* 15 Cal.App.3d 244, it was held that the father had not received his daughter into his family, although he had seen her five hours each week pursuant to a court decree

---

[11]All of these authorities rely heavily upon California cases in support of the rules they enunciate.

giving him visitation rights. Therefore, the father was not able to prevent the adoption of his child by the mother's husband.[12] In so holding, the court emphasized that the mother never consented to the visitation and never relinquished complete guardianship control. (*Id.,* at p. 251.)

Nevertheless, the *Pierce* decision is not determinative of the issue now before us. In *Pierce* the Court of Appeal merely upheld the trial court's finding as to this requirement, noting that "[t]he conclusion reached by the trial court that there was no 'legitimation' prior to the inverse paternity action can hardly be questioned, let alone upset, as an improper determination of the conflicting evidence." (*Id.,* at p. 248.) Similarly, the trial court in the case at bench found on the basis of substantial evidence that the father did receive his son into his family for purposes of section 230; no grounds exist for overturning this determination.

It is also noteworthy that in each of these four cases, "[t]he resolution of the issues . . . [therein did] not require the application of the policy of the law which favors legitimation, since in any event the child . . . [would] be legitimated, either by acknowledgment by its father under Civil Code, section 230, or by adoption . . . ." (*Adoption of Irby, supra,* 226 Cal.App.2d at p. 240; see also *Adoption of Graham, supra,* 58 Cal.2d 899, 904.) In the instant case, on the other hand, a finding that the father did not legitimate the minor would have the unfortunate effect of returning the child to the status of illegitimate, with its attendant stigma and unfavorable legal treatment.

To the extent that *Cheryl H.* v. *Superior Court, supra,* 41 Cal.App.3d 273, *Adoption of Pierce, supra,* 15 Cal.App.3d 244, *Guardianship of Truschke, supra,* 237 Cal.App.2d 75, and *Adoption of Irby, supra,* 226 Cal.App.2d 238, are inconsistent with this opinion, they are disapproved.

■ We encounter even less difficulty in upholding the trial court's determination that the father treated the boy as if he were a legitimate child. Once again, there are no hard and fast rules establishing specific standards which must be fulfilled in every case. Rather, "[e]very man furnishes the rule by which he must be measured." (*Blythe* v. *Ayres, supra,* 96 Cal. at p. 580.) "The statute clearly means that the father must treat his illegitimate child as he would naturally treat his legitimate child [under the particular circumstances], not as the majority of men in his

---

[12]Section 224 provides that an illegitimate child may not be adopted without the consent of its mother. The father's consent is not statutorily required.

financial circumstances would or should treat their children." (*Blythe* v. *Ayres, supra,* 96 Cal. at p. 580; see also *Estate of Lund, supra,* 26 Cal.2d at p. 494; *Estate of Jones, supra,* 166 Cal. at p. 116; 10 Am.Jur.2d, Bastards, § 52, p. 881.)

In determining whether this requirement has been fulfilled, courts look for conduct manifesting the father's desire to establish and maintain a paternal relationship with his child. As a general rule, conduct which satisfies the acknowledgment and receipt requirements is also adequate to fulfill this final statutory mandate.[13] "If the father has publicly acknowledged the child to be his child, and has taken it into his family, it would seem but little remained to be done to wash away forever the stain of bastardy. The public acknowledgment of the child is the main fact. It is the important factor, in the eyes of the statute. If the child was publicly acknowledged and received into the family, it would be a novel case where a court of equity would close its doors and refuse to declare a legitimation . . . . That case has not yet arisen; and it is hoped and believed it never will." (*Blythe* v. *Ayres, supra,* 96 Cal. at p. 580; see also *Estate of Wilson, supra,* 164 Cal.App.2d at p. 389.)

In *Estate of Peterson, supra,* 214 Cal.App.2d 258, the father's letters to his daughter expressing his love, affection and admiration for her, his $5 birthday gift, and the acknowledgment of paternity to his friends fulfilled the section 230 requirement that he treat her as legitimate. (*Id.,* at p. 265.) The father in *Lavell* v. *Adoption Institute, supra,* 185 Cal.App.2d 557, satisfied this condition by providing a home for the child's mother and supporting her for two years prior to the child's birth. (*Id.,* at pp. 561-562.) Under the particular facts of that case, the court believed that "it would [not] be reasonable, and it certainly would be most unfair to children in those circumstances, to hold that the efforts the father had made, in every way in which it was possible for him to make efforts to give the child the status of legitimacy, should go for naught." (*Id.,* at p. 562.)

In the instant case, the father's conduct manifested a sincere desire and attempt to treat the boy as his own. He acknowledged paternity to his family and friends. From the time the child was born, he participated in caring for him and administering to his needs. He regularly took the child into his home for frequent visits, both before and after he was married.

---

[13]Our attention has not been directed to any case in which a finding of legitimation was defeated on the grounds that a father who had acknowledged the child as his own and received it into his family did not otherwise treat it as legitimate.

The mother points out that the father never paid her anything for the boy's support; however, this fact alone is not determinative. The father did assume full financial responsibility for the minor's care while the child was in his custody. This included the purchase of clothing, food, medicine and toys. That the father may have been able to afford more is not a crucial factor.

We conclude that overwhelming evidence supports the trial court's finding that the father treated his son as if he were a legitimate child.

### III

Finally, the mother contends that although there may be sufficient evidence to support a legitimation by the father in other factual contexts, section 230 simply cannot be availed of under these circumstances to derogate from the exclusive custody of an illegitimate child vested in its mother under section 200. Her position is that " 'there is no sound basis for using the section [230] to alter the right of the mother of the child to its custody if she does not want to give it up voluntarily.' " (*Adoption of Pierce, supra,* 15 Cal.App.3d at p. 251, fn. 11, quoting from Note, *Parent and Child-Right of the Father to Adopt Illegitimate Child Without Consent of the Mother* (1938) 12 So.Cal.L.Rev. 97, 98.) No California court, she urges, has used section 230 as a basis for taking the custody of an illegitimate child from a fit mother against her will.

In countering this argument and simultaneously attacking section 200, the father takes the position that current California law violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and article I, section 7, of the California Constitution, insofar as it denies to fathers of illegitimate children those custody rights enjoyed by other parents. He relies for support upon *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208],[14] as well as upon various commentators who assert that California's statutory scheme governing parental custody rights in illegitimate children is constitutionally defective in light of *Stanley.* (See, e.g., Rich, *Plight of the Putative Father in California Child Custody Proceedings: A Problem of Equal Protection* (1973) 6 U.C. Davis L.Rev. 1, 11-23.)

---

[14]In *Stanley* v. *Illinois, supra,* 405 U.S. 645, the United States Supreme Court held that an Illinois statute pursuant to which illegitimate children could be removed from their father's custody without notice, a hearing and proof of neglect violated the due process and equal protection clauses of the United States Constitution.

Since we find the mother's argument to be devoid of merit, we do not reach the constitutional issue. Section 230 specifically states that once a father has satisfied the statutory requirements, the "child is thereupon deemed *for all purposes* legitimate from the time of its birth." (Italics added.) Thus, the father and mother of a legitimated child have rights and obligations with respect to their offspring identical to those of parents whose child is born legitimate. As California law governing parental custody rights imposes numerous distinctions on the basis of legitimacy,[15] a court resolving a custody dispute must determine whether or not the minor is legitimate before it can identify the applicable statutory provisions. Once a court finds that a father has fulfilled the requirements of section 230, it must apply statutes governing custody of legitimate offspring, giving both parents equal rights thereto, and resolve the dispute between mother and father according to the child's best interests. In the matter presently before us, the court properly found, on the basis of substantial evidence, that Richard M. was a legitimate child. Therefore, section 200 was not relevant to the court's determination as to which parent should be awarded custody.

To recapitulate, we conclude: (1) That there is substantial evidence to support the trial court's determination that Jesse H. legitimated Richard M. pursuant to section 230; (2) that as a result Jesse H. acquired custody rights in respect to Richard M. equal to those of Dolores L.; (3) that since Dolores L. has established no countervailing grounds for relief, she is not entitled to a writ of habeas corpus returning Richard M. to her custody.

The order to show cause is discharged and the petition for a writ of habeas corpus is denied.

Wright, C. J., McComb, J., Tobriner; J., Mosk, J., Clark, J., and Burke, J.,* concurred.

---

[15]For an extensive discussion of these distinctions, see Rich, *Plight of the Putative Father in California Child Custody Proceedings: A Problem of Equal Protection* (1973) 6 U.C. Davis L.Rev. 1, 3-11.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.