48 Cal.App.4th 1647 (1996)
In re SPENCER W., a Minor.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
LEONARD B., Defendant and Appellant.
Docket No. D025123.
Court of Appeals of California, Fourth District, Division One.
July 30, 1996.
*1649 COUNSEL
Linda Casey Mackey, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, Acting County Counsel, Susan Strom, Chief Deputy County Counsel, and Kathryn E. Krug, Deputy County Counsel, for Plaintiff and Respondent.
Robert Wayne Gehring, under appointment by the Court of Appeal, for Minor.
OPINION
McDONALD, J.
In this dependency proceeding involving the minor Spencer W., appellant Leonard B. (Leonard) claims he is entitled to the rights and services accorded a "presumed father." In an earlier appeal, this *1650 court ruled the trial court had erred by terminating Leonard's parental rights without first according him a hearing on his claim that he was Spencer's presumed father. (In re Spencer W. (Apr. 25, 1995) D022067 [nonpub. opn.]; hereafter Leonard I.) On remand, the trial court conducted a hearing and ruled that under the totality of the circumstances Leonard was not Spencer's presumed father.
Leonard claims the facts show he was a presumed father.[1] From that predicate, he argues the department of social services (the Department) was obliged but failed to produce "clear and convincing evidence" to rebut this presumption.

1. Facts

(1) Because Leonard challenges the judgment on the basis it is not supported by adequate evidence, we review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. (In re Misako R. (1991) 2 Cal. App.4th 538, 545 [3 Cal. Rptr.2d 217].) We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent. (In re Angelia P. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637, 623 P.2d 198].)
Spencer was born December 7, 1989. At that time, Leonard and Spencer's mother (mother) shared an apartment but were not married. Leonard was present at Spencer's birth. Although Leonard claimed to be Spencer's biological father, he admitted he was not living with mother at the time Spencer was conceived. He also admitted there was evidence the biological father could have been anyone because mother had been a prostitute prior to Spencer's conception. Leonard did not have his name placed on the birth certificate as Spencer's father when Spencer was born.
Leonard shared an apartment with mother and Spencer from December 1989 through January 1992. Leonard was basically unemployed for this entire period, and he and mother lived on mother's aid to families with dependent children (AFDC) income.[2]
*1651 During this two-year period, Leonard was equivocal in asserting his parental relationship to Spencer. Leonard testified he told his friends, relatives and neighbors that he was Spencer's father and that Spencer called him "daddy." Leonard also took Spencer on outings, provided child care and disciplined Spencer. However, Leonard never contacted AFDC officials to inform them of his relationship to Spencer. He never sought to have his name put on Spencer's birth certificate, and took no other legal action during this period to establish paternity. Indeed, when a social worker visited the apartment in July 1991 to investigate an incident involving Spencer's falling from a window, Leonard specifically told the social worker he was not Spencer's father. Leonard testified he denied paternity to that social worker to avoid reducing mother's AFDC income.
Mother was arrested for prostitution and jailed from November 1991 through mid-January 1992. Leonard stayed at the apartment, the rent for which came from mother's AFDC checks, and took care of Spencer and Spencer's sister during this time. Leonard collected mother's AFDC check and paid the rent from those funds. When mother was again incarcerated in February 1992 and the AFDC payments were stopped, Leonard separated from mother. He took Spencer and Spencer's sister to, and left them with, a friend of mother's. He returned the next day to the home of the mother's friend and was told the children had been taken to live at the home of the maternal grandmother. He testified he made an attempt to visit Spencer but was rebuffed by the maternal relatives. Leonard then decided to wait the 90 days until mother was released from jail to try again to visit Spencer.
During the period the children were living with the grandparents, Leonard took no steps to assert paternity, and he provided them no monetary support. On May 9, 1992, mother was released from jail and Leonard helped her, Spencer and Spencer's sister move from the grandparents' house into a friend's home. He left them there and was arrested the next morning.
Leonard was incarcerated from May 10, 1992, until August 24, 1994. During July 1992 he telephoned the social worker handling Spencer's case and claimed to be the father, but the social worker gave him no information because mother claimed Leonard was not the father. Other than this occasion (and perhaps two similar phone calls) Leonard showed no interest in pursuing his parental rights during this two-year period. Although Leonard learned from a friend that the Department had intervened and Spencer had been made a dependent of the court, Leonard never asked the friend to contact the Department or the court, and he never asked the friend for *1652 information about Spencer's whereabouts or circumstances. He never called the court and never had any contact or correspondence with Spencer.
Prior to these proceedings, Leonard never sought custody of Spencer. He never paid any child support. Indeed, in August 1995 when the trial court ordered Leonard to participate in a paternity blood test, he failed to cooperate with the Department's efforts to arrange for the test.

2. Leonard Had the Burden of Establishing He Was Entitled to Presumed Father Status

California law provides that a man is presumed to be the father of a child if he "receives the child into his home and openly holds out the child as his natural child." (Fam. Code,[3] § 7611, subd. (d).) (2) As explained in Adoption of Michael H. (1995) 10 Cal.4th 1043 [43 Cal. Rptr.2d 445, 898 P.2d 891]: "An unwed father's rights and duties ... substantially depend on whether he is a `presumed father' within the meaning of section 7611. ([Adoption of Kelsey S. (1992)] 1 Cal.4th 816, 823 [4 Cal. Rptr.2d 615, 823 P.2d 1216] [`Whether a biological father is a "presumed father" ... is critical to his parental rights [in adoption proceedings.']; see also In re Zacharia D. (1993) 6 Cal.4th 435, 448-449 [24 Cal. Rptr.2d 751, 862 P.2d 751] [only `presumed fathers' are entitled to custody and reunification services].) Under section 7611, a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he both `receives the child into his home and openly holds out the child as his natural child.' (§ 7611, subd. (d), italics added.) ... Therefore, to become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also physically bring the child into his home." (Id. at pp. 1050-1051, some italics original, some italics deleted.)
(3a) Leonard argues that because he lived with mother and Spencer for two years and told some people he was Spencer's father, the presumption set forth in section 7611, subdivision (d) arose, and under section 7612, subdivision (a) the burden of rebutting the presumption by "clear and convincing" evidence was shifted to the Department. However, Leonard's argument regarding the burden of proof rests on an erroneous assumption that as a matter of law he was entitled to the benefit of the presumption. For the rebuttable presumption to arise, Leonard had the burden of establishing by a preponderance of the evidence that there were present two elements necessary to invoke the presumption: reception into the father's home and openly and publicly acknowledging paternity. (Xebec Development Partners, Ltd. v. *1653 National Union Fire Ins. Co. (1993) 12 Cal. App.4th 501, 544-546 [15 Cal. Rptr.2d 726] [to obtain benefit of presumption, proponent of presumption bears burden of establishing foundational facts by preponderance of evidence].) (4) As the court explained in United Sav. & Loan Assn. v. Reeder Dev. Corp. (1976) 57 Cal. App.3d 282 [129 Cal. Rptr. 113]: "The proponent of the presumption has the burden of proving, by a preponderance of the evidence, the foundational facts of the presumption. As in the case of all presumptions, the opponent may introduce evidence tending to establish the nonexistence of the foundational facts, or the presumed fact, or both. [¶] [When] the opponent of the presumption offer[s] evidence that [the foundational facts are not present], the attack is not upon the existence of the presumed fact, but upon the existence of the foundational facts of the presumption. Hence, the trier of fact in this situation is required to determine only whether the proponent of the presumption has established, by a preponderance of the evidence, the existence of the foundational facts...." (Id. at p. 300, italics original.)
(3b) Thus, the burden of proof rested on Leonard to show that he received the child into his home and that he openly and publicly acknowledged paternity. It was for the trier of fact to determine whether the foundational facts were established by a preponderance of evidence. (Xebec Development Partners, Ltd. v. National Union Fire Ins. Co., supra, 12 Cal. App.4th at p. 545.)

3. Substantial Evidence Supports the Trial Court's Rejection of Leonard's Claim to Presumed Father Status

The trial court rejected Leonard's claim to presumed father status. It reasoned that the totality of the circumstances failed to show Leonard demonstrated a consistent commitment to assume the burdens of parenthood.
The evidence here would permit a trier of fact to conclude that neither foundational element necessary to presumed father status was present. First, Leonard was required to receive Spencer into his home. The evidence permitted the conclusion that Leonard did not receive the child into his home, but instead that mother permitted Leonard to reside in her home, and that Leonard's residence with Spencer was not demonstrative of Leonard's commitment to the child but reflected that Leonard acted out of personal convenience and self-interest. This conclusion is amply supported by these facts: (1) mother paid for the apartment (and apparently most other expenses); (2) she supported an unemployed Leonard; and (3) when mother's funding ceased Leonard stopped residing with Spencer.
Second, a trier of fact could conclude Leonard's actions, as a whole, were not sufficient to satisfy the requirement that Leonard "openly and publicly *1654 admit paternity." (Adoption of Michael H. (1995) 10 Cal.4th 1043, 1051 [43 Cal. Rptr.2d 445, 898 P.2d 891].) The evidence showed Leonard claimed paternity to his friends and family but was unwilling to proclaim paternity when there might have been some cost to him (i.e., reduced AFDC payments). Leonard also failed to take formal steps to place his name on the birth certificate, to establish paternity by legal action, or to assume the financial obligations for child support. Leonard took no steps to assert his parental rights when the maternal grandparents denied Leonard access to Spencer. (Cf. Adoption of Kelsey S. (1992) 1 Cal.4th 816, 849 [4 Cal. Rptr.2d 615, 823 P.2d 1216] [unwed biological father to obtain presumed father status must promptly attempt to assume full parental responsibilities, and particularly show "`a willingness himself to assume full custody of the child  not merely to block the adoption by others.'"].) Finally, except for a few phone calls Leonard made to a social worker, his years in prison were marked by an indifference toward establishing or maintaining a parental relationship with Spencer.[4]
Leonard quotes People v. Vega (1995) 33 Cal. App.4th 706, 710 [39 Cal. Rptr.2d 479] as holding that to attain presumed father status he need only show "some familial relationship." We do not believe that "some" familial relationship suffices.[5] We perceive the holding in In re Sarah C. (1992) 8 Cal. App.4th 964 [11 Cal. Rptr.2d 414] to reflect more accurately what is required to establish presumed father status. There the claimant had told some people he was the father; however, he took no steps to have his name put on the child's birth certificate; he never took formal steps to identify her to governmental agencies as his daughter; he lived with her and her mother only because he needed a place to stay; he provided her little economic support; and he made negligible efforts while imprisoned to contact her or establish a relationship with her. (Id. at pp. 972-973, 977.) In Sarah C. the court reasoned that presumed father status is earned based on a *1655 commitment toward developing a "substantial familial relationship to the child," and that the trial court had ample basis for denying presumed father status even to the biological father on the facts of the case. (Id. at pp. 974-975.)
The reasoning of Sarah C. applies here. The trial court had ample basis on which to conclude Leonard failed to show by a preponderance of evidence the existence of either foundational element required for presumed father status. Therefore, it was unnecessary for the Department to rebut the presumption. The trial court correctly declined to confer "presumed father status" on Leonard.

DISPOSITION
The judgment is affirmed.
Benke, Acting P.J., and Huffman, J., concurred.
Appellant's petition for review by the Supreme Court was denied October 23, 1996.
NOTES
[1] Leonard also appears to argue, by implication from quotations from Leonard I, that this court held he was entitled to presumed father status. However, because this court expressly stated it did not decide that issue (Leonard I, supra, D022067), there is no "law of the case" principle applicable to this issue. (Estate of Baird (1924) 193 Cal. 225, 239 [223 P. 974].)
[2] Leonard claimed he earned money from "odd jobs." He also claimed he held a cashier's job for a four-month period in 1991, although the credibility of this claim was questionable because he had originally denied having any jobs after December 1989. After being cross-examined about not providing financial support to Spencer, he suddenly remembered having a cashier's job.
[3] All further references are to the Family Code unless otherwise specified.
[4] Leonard argues the trial court improperly relied on his inactivity while incarcerated to find he had "abandoned" Spencer, because a presumed father will be deemed to have abandoned the child and to have forfeited rights only if his failure to communicate is willful (Adoption of Christopher S. (1987) 197 Cal. App.3d 433, 436 [242 Cal. Rptr. 866]), and here the failure to communicate was not "willful" because he was refused information by the social worker. Leonard misconstrues the trial court's reasoning. The trial court examined his inaction not as a basis to forfeit rights but rather to evaluate whether he had shown the level of diligent commitment required to attain rights.
[5] We note the Vega court's reference to "some" familial relationship is not controlling because the court was concerned with an entirely different issue (i.e., when a defendant can be held liable under a criminal statute for corporal injury to spouse), and had no occasion to evaluate the level of familial contact necessary for presumed father status. (33 Cal. App.4th at pp. 709-711.) Moreover, to the extent Vega could be read for the proposition that any familial relationship (however sporadic or equivocal) is sufficient, Vega would be inconsistent with Adoption of Michael H., supra, 10 Cal.4th 1043 and Adoption of Kelsey S., supra, 1 Cal.4th 816.