Filed 9/18/15  In re K.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | |
| | D067793 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518829) |
| v. | |
| D.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

D.M. appeals from an order denying his request for presumed father status with respect to minor K.C. under Family Code section 7611, subdivision (d) (hereafter section 7611(d)).[1] Section 7611(d) creates a presumption that a person is the natural parent of a child if the person shows by a preponderance of the evidence that he or she "receive[d] the child into his or her home and openly [held] out the child as his or her natural child." (§ 7611(d); *In re T.R.* (2005) 132 Cal.App.4th 1202, 1211 (*T.R.*).)

D.M. claims he met the section 7611(d) requirements and the juvenile court erred in denying presumed father status. We find substantial evidence supports the juvenile court's order and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

K.C. was born in April 2013. The San Diego County Health and Human Services Agency (Agency) opened her dependency case in November 2013 when she was seven months old, after its child abuse hotline received a referral alleging general neglect and caretaker absence and incapacity. The report alleged her mother, T.C., had left K.C. with the child's paternal grandmother, F.M., the prior day and had not returned for her, and also expressed concerns T.C. had been intoxicated and not caring for K.C. Agency staff subsequently took K.C. into protective custody.

---

[1] Statutory references are to the Family Code unless otherwise noted. D.M. also appealed the order terminating his parental rights under Welfare and Institutions Code section 366.26, but asserts no claim of error as to that order. Accordingly, we deem that portion of his appeal abandoned. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) K.C.'s mother, T.C., does not appeal.

A social worker investigated the situation. T.C. told the social worker she believed D.M. was the father, but she had been in a sexual relationship with another man, Kenneth K., at the same time. T.C. and F.M. reported D.M. was homeless, although he sometimes went to F.M.'s house for food. T.C. described D.M. as a methamphetamine user and drug addict and mentioned she had no way to reach him. In addition, D.M. had a criminal record as both a juvenile and adult, including two recent arrests. The social worker was not able to locate D.M. for an interview.

Shortly thereafter, the Agency filed a juvenile dependency petition on K.C.'s behalf. At the detention hearing, the juvenile court detained K.C., identified D.M. and Kenneth as alleged fathers, and ordered the Agency to conduct a reasonable search to locate and notify them about the proceedings. The social worker made multiple attempts to reach D.M., both directly and through F.M., and F.M. indicated that she had given the social worker's contact information to D.M. However, D.M. failed to contact the social worker or appear for a scheduled meeting that F.M. agreed he would attend. Because the Agency could not locate D.M., he did not receive services or legal counsel.

In February 2014, the juvenile court held the jurisdictional and dispositional hearing during which it found jurisdiction and declared K.C. a dependent child. D.M. did not attend, although F.M. had indicated he would. At the hearing, Kenneth requested a paternity test. The results confirmed he was not K.C.'s biological father.[2]

---

[2]    The juvenile court later struck Kenneth as an alleged father and entered a judgment of nonpaternity.

Throughout the spring and summer of 2014, the social worker left several additional voice mails for F.M., asking her or D.M. to return the calls, but received no response. D.M. was arrested again in July 2014 and incarcerated at the East Mesa Detention Center Jail Facility with an approximate release date of December 6, 2014.[3]

At the six-month review hearing in September 2014, the juvenile court identified adoption as K.C.'s permanent plan and set the Welfare and Institutions Code section 366.26 hearing for December 30, 2014. D.M. received personal service of the notice for the hearing but did not attend. At that hearing, the Agency requested a continuance so it could continue to assess the most appropriate permanent plan. The juvenile court granted the request and continued the hearing to March 2015.

On January 5, 2015, D.M. called the social worker and requested counsel. Later in January 2015, the juvenile court conducted a special hearing to appoint counsel for D.M., which he attended. At the special hearing, D.M. was appointed counsel and asked to elevate his status to presumed father under section 7611(d). T.C. opposed the request. The court ordered T.C. to complete a parentage questionnaire regarding D.M., set a contested special hearing on paternity for February 19, 2015, and confirmed the Welfare and Institutions Code section 366.26 hearing for March 2015.

D.M. and T.C. both submitted their parentage questionnaires. D.M.'s form indicated K.C. lived with him for period of time after she was born, she had been to his

---

3  F.M. told the social worker D.M. also had been incarcerated earlier in the year between February 2014 and May 2014, but later acknowledged she could not remember when he had been incarcerated.

home every week after she went home with T.C., and he had supported her.  He further indicated he did not sign a declaration of paternity and had agreed to be listed as the child's father on the birth certificate, but was not sure whether he was.  He also stated the individuals he told he was K.C.'s father were "mom" and "paternal grandmother."  T.C.'s questionnaire said D.M. "was happy for a short period" after learning he was K.C.'s father and was at the hospital for the birth.  However, her form stated K.C. had not lived with D.M. but had been to his home.

At the paternity hearing, D.M. and F.M. testified.  According to their testimony, at some point after K.C.'s birth, D.M., T.C., and K.C. stayed with the paternal grandmother, F.M., and her fiancé in F.M.'s home.  D.M.'s and F.M.'s recollections concerning the stay differ.  D.M. testified this stay lasted approximately a month and a half and occurred right after K.C. was born.  D.M. claimed he supplied K.C. with clothes, food, and diapers during this period.  He also recalled caring for K.C., by feeding her, changing her diapers and clothes, and bathing her daily after work, along with his mother.  D.M. said he stopped caring for her in May 2013 because her "mother wanted her back."

F.M. agreed D.M., T.C., and K.C. had an extended stay with her, but believed it was for about a month and from October to early November 2013.  She said K.C. also stayed with her for three days after she was born and then for visits but did not specify whether D.M. was present for these visits.  With respect to the extended stay, F.M. testified D.M. only provided diapers for K.C. once and she and her fiancé provided most of her needs, including formula, diapers, shoes, clothing, a crib, a stroller, and toys.  According to F.M., she and her fiancé also provided for K.C.'s daily care, including

5

bathing her every other day.  She reported D.M. initially had taken sole care of K.C. for about a week, but this fell to a couple of hours throughout the day.  F.M. recalled that when D.M. did care for K.C., he did so after work by taking her on walks, feeding her, putting her to sleep, dressing her, and helping with baths a couple of times as well as similar tasks.

D.M. also testified K.C. stayed with him for another one-week stay at F.M.'s home in June 2013 and that this was the last time he saw her (in contrast to his earlier claim on the parentage questionnaire that he saw her weekly).  He said he tried to reach T.C. by phone and Facebook on June 15, 2013, but received no response and did not otherwise try to contact K.C.[4]  D.M. also addressed the birth certificate, explaining he was supposed to sign it when K.C. was born; however, he had to leave the hospital for work and T.C. left before he could return.  He made no subsequent attempt to place his name on the birth certificate.  D.M. further testified that during the time K.C. lived with him, he referred to her as his daughter.  Following the witness testimony, the juvenile court admitted D.M.'s and T.C.'s parentage questionnaires into evidence.

The court found insufficient evidence to elevate D.M.'s status under section 7611(d) and denied his request.  The court observed that, other than sporadic visits, K.C. had only lived with D.M. for a little over a month early in her life, F.M. and her fiancé provided most of the child's support and care during this period, and the house in which

---

[4]     During the investigation, T.C. had recalled a recent incident in which she left K.C. with D.M. and learned his girlfriend dropped her.  It is not clear when this happened, but we assume it was during one of the periods when D.M. or F.M. reports he cared for K.C. and does not reflect a separate period of care.

they resided was F.M.'s home, not D.M.'s. It noted other issues supporting its conclusion, including D.M.'s absence at the outset of the dependency proceeding, his history of drug use and homelessness, and his failure to update the birth certificate when he knew he had the opportunity to do so. The court concluded D.M.'s level of care, which it described as "minimal for just over a month," did not reflect "a consistent commitment to assume the responsibilities of parenthood."

The court then ordered a paternity test, which was scheduled later that month. D.M. did not take it, although the social worker attempted to remind him (after reaching D.M.'s full voice mail box, he contacted F.M., who stated "he will be there"). When the social worker spoke with D.M. the day after the scheduled test, D.M. replied "oh that was yesterday, I forgot."

At the Welfare and Institutions Code section 366.26 hearing the following month in March 2015, the juvenile court rejected D.M.'s request for a continuance to submit a paternity test, finding no good cause to do so, terminated parental rights, and referred K.C. for adoptive placement.

D.M. timely appealed.

## DISCUSSION

### I. *Relevant Law*

Presumed parent status is defined under the provisions of the Uniform Parentage Act of 1973 (§ 7600 et seq., hereafter UPA). For purposes of dependency proceedings, presumed parent " 'denotes one who "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise[.]" ' "

7

(*T.R., supra,* 132 Cal.App.4th at pp. 1209-1210.)  One way for a person to achieve presumed parent status is to "receive[] the child into his or her home and openly hold[] out the child as his or her natural child."  (§ 7611(d).)

A person claiming entitlement to presumed parent status has the burden of establishing, by a preponderance of the evidence, the facts supporting such entitlement.  (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211; *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653 (*Spencer*).)  In determining whether someone has met this burden with respect to section 7611(d), " 'courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental.' "  (*In re J.H.* (2011) 198 Cal.App.4th 635, 646 (*J.H.*), quoting *T.R.*, *supra*, 132 Cal.App.4th at p. 1211.)  A person does not need to establish "each and every one of these factors"; rather, they are the " 'types of factors [the] trial courts may consider.' "  (*S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, 1034, fn. 10, italics omitted.)

We review the juvenile court's determination for substantial evidence.  (*J.H.*, *supra*, 198 Cal.App.4th at p. 646; *Spencer*, *supra*, 48 Cal.App.4th at p. 1653.)  In this

8

regard, we do not reweigh evidence. (*Spencer*, at p. 1650.) Rather, "we review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order." (*Ibid.*) The appellant has the burden of establishing the order is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II. *Analysis*

The juvenile court found there was insufficient evidence to elevate D.M. to a presumed parent under section 7611(d). On appeal, D.M. claims the court erred because the evidence showed he received K.C. into his home and held her out as his natural daughter. We disagree and there is substantial evidence to support the court's finding D.M. did not satisfy section 7611(d).

The record reflects D.M. and K.C. resided in the same home for only a little over a month. Although D.M. assisted with K.C.'s care when he was not at work, his mother F.M. and her fiancé were K.C.'s primary caretakers and providers during this period. D.M. also had sporadic visits with K.C. D.M. testified he stopped caring for her because T.C. wanted her back. Even accepting this as true, the record establishes D.M. made no effort to pursue visitation or provide support. (See *In re A.A.* (2003) 114 Cal.App.4th 771, 787 (*A.A.*) [biological father was not a presumed father; among other things, there was no evidence he sought visitation, but rather "just let contact with the minor slide"].) This kind of temporary, incidental care is insufficient to establish presumed parenthood.

9

(See *id*. at pp. 786, 788 [noting "one[-] to three[-]"month period of residing with the child and mother was "exceedingly small"]; *J.H.*, *supra*, 198 Cal.App.4th at p. 646.)[5]

Moreover, the home into which D.M. purportedly received K.C. was not his home but that of his mother. Section 7611(d) requires the person seeking presumed status to receive the child into "his or her home." (See *A.A.*, *supra*, 114 Cal.App.4th at pp. 786, 788 [biological father's visits with the child were at the grandparents' homes, permitting him to "avoid the constant parental-type tasks that come with having the child in his own home"]; *Spencer*, *supra*, 48 Cal.App.4th at p. 1653 [purported father was not a presumed father; the facts showed he "did not receive the child into *his* home, but instead that [the] mother permitted [him] to reside in *her* home," and that he did so for his own convenience].)

The evidence shows D.M.'s efforts to acknowledge and establish paternity were likewise minimal and anything but prompt. D.M. claims he held K.C. out as his daughter, but provides little evidence of such recognition. His only testimony on the subject was that when K.C. lived with him (which was for just over a month), he referred to her as his daughter. Meanwhile, on the paternity questionnaire, he identified only "mom" and "paternal grandmother" as the individuals he told he was K.C.'s father. (See

---

5    D.M. cannot rely on *In re Richard M.* (1975) 14 Cal.3d 783 (*Richard M.*) to suggest his level of contact with K.C. was sufficient. Not only was *Richard M.* decided in a different statutory context where legitimacy was at issue and the law was construed liberally to find it, but also its facts reflect significantly more interaction than is evident between D.M. and K.C. here. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 828 [noting differing context in which *Richard M.* was decided and explaining the UPA abolished the legitimacy concept]; *Richard M*., at pp. 795-796.)

*J.H.*, *supra*, 198 Cal.App.4th at p. 646 [alleged father was not a presumed father; it was not clear "when, if at all, [he] publicly acknowledged [the child] was his son"].)

D.M. also did not sign a declaration of paternity or update the birth certificate. Even assuming he was unable to sign the birth certificate when K.C. was born, as he suggests, he made no other effort to make sure he was identified as the father. (See *J.H.*, *supra*, 198 Cal.App.4th at p. 646 [alleged father did not seek to have his name on the birth certificate]; accord *Spencer*, *supra*, 48 Cal.App.4th at p. 1651; *In re Sarah C.* (1992) 8 Cal.App.4th 964, 973.)

Finally, D.M. did not pursue a legal relationship with K.C. prior to her dependency proceeding. Even after the proceeding commenced in November 2013, giving him access to a social worker who could facilitate that relationship, he was largely nonresponsive and did not seek presumed father status until January 2015, more than a year after the proceeding commenced. Then, after the juvenile court denied presumed father status and ordered him to take a paternity test, he failed to do so, claiming he "forgot." (See *J.H.*, *supra*, 198 Cal.App.4th at p. 647 [alleged father "did nothing to legally establish his status" and "never took legal action to seek custody . . . until the dependency proceedings began"]; *Spencer*, *supra*, 48 Cal.App.4th at p. 1651 [purported father failed to cooperate with court-ordered paternity test].)

The evidence shows D.M.'s conduct did not reflect the requisite full and prompt commitment to the responsibilities of parenthood. (*T.R.*, *supra*, 132 Cal.App.4th at pp. 1211-1212.) We find substantial evidence supports the finding that he failed to establish presumed parent status under section 7611(d).

11

DISPOSITION

The order is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.