Filed 8/20/21  In re B.G. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION TWO

| | |
|---|---|
| In re B.G., a Person Coming Under the Juvenile Court Law. | B309291 (Los Angeles County Super. Ct. No. 17CCJP01670C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MANUEL G.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Removal order conditionally reversed and remanded with directions.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Melania Vartanian, Deputy County Counsel for Plaintiff and Respondent.

_____

This appeal follows the juvenile court's disposition order removing two-year-old B.G. from parental custody. Manuel G. (Manuel) challenges the court's order denying his request for presumed father status under Family Code section 7611, subdivision (d). He also contends the court's finding the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) did not apply is based on insufficient evidence the Los Angeles County Department of Children and Family Services (Department) discharged its duty of further inquiry and on defective notice to the Indian tribes. We conditionally reverse and remand with directions.

## BACKGROUND

B.G. was born in September 2018. He is the son of Manuel and Kimberly M. (Kimberly). B.G. has an older half sister. She was the subject of a 2018 juvenile dependency petition sustained against Kimberly before B.G. was born. The allegations found true by the juvenile court related to Kimberly's chronic substance abuse and mental health issues.

B.G. was conceived during Manuel's two-week relationship with Kimberly. They were no longer sexually intimate but remained in phone contact. In March 2020, Manuel was arrested for murder and remained incarcerated throughout these proceedings. Prior to this arrest, Manuel was in and out of

2

custody for probation violations and felony vandalism. He had a criminal record.

In June 2020, the Department filed a juvenile dependency petition on behalf of B.G. and his half sister against Kimberly and Manuel. The children were taken into protective custody and placed with maternal grandmother.

At the November 2020 jurisdiction and disposition hearing, the juvenile court found no reason for ICWA to apply following the Department's investigation of Manuel's purported Indian heritage. Earlier, the court had made the same finding as to Kimberly. The court declared the children dependents of the court and sustained allegations of Kimberly's substance abuse and mental health issues. (Welf. & Inst. Code, § 300, subd. (b).)[1] The court dismissed the allegation that Manuel's criminal history and current incarceration endangered B.G. (§ 300, subd. (b).)

The children were ordered to be removed from the parents' custody and to remain placed with maternal grandmother.[2] The court refused Manuel's request as a nonoffending parent to be found B.G.'s presumed father and denied him reunification services.[3] Manuel appealed. Kimberly is not a party to this appeal.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] We refer to relatives in terms of how they relate to B.G.

[3] Half sister's alleged father denied paternity and refused to participate in this case.

## DISCUSSION

### 1. Manuel's Paternity—Facts and Proceedings

At the detention hearing, the juvenile court relied on a positive paternity test and Kimberly's responses to a Parentage Questionnaire to declare Manuel a biological father. Kimberly identified Manuel as B.G.'s biological father based on a paternity test but added they were not married and Manuel had not signed the birth certificate.[4] Kimberly stated Manuel held himself out openly as B.G.'s father but had not received B.G. into his home, or had helped support B.G. by paying rent, buying necessities, or by having a relationship with him.

The juvenile court deferred Manuel's request to be found B.G.'s presumed father until Manuel, who was still in custody, could appear either in person or by video.

An August 2020 Department report, prepared for the jurisdiction and disposition hearing, included statements by Manuel, Kimberly, paternal grandmother, and maternal grandmother, pertinent to Manuel's paternity status.

Manuel stated he initially doubted he was B.G.'s father until the positive paternity test. Before his arrest for murder, Manuel would "mostly visit [B.G.] on weekends and sometimes a couple of times during the week." They "would spend weekends together." He also told the Department he "would normally pick up [his] son [from maternal grandmother's home] and take him out." Manuel was "[m]aking an effort to be a part of my son's life. I went through a lot with my dad, so I try to be there for my son."

As is pertinent here, Manuel's criminal record showed he was convicted in 2016 for obstructing a police officer (Pen. Code,

---

[4] The Department confirmed the birth certificate did not list the father's name and there were no "family law orders."

4

§ 148, subd. (a)(1)) and was sentenced to some jail time and given probation. In January 2019, Manuel was arrested for violating probation. In September 2019, he was convicted of felony vandalism, sentenced to 365 days in jail and placed on 36 months of probation. In November 2019, Manuel was arrested for violating probation. In March 2020, he was arrested for murder.

Kimberly reported that she and her two children had moved in with maternal grandmother after B.G. was born. B.G. had "limited contact" since birth with Manuel because of Manuel's "gang affiliation and recent arrest." Kimberly confirmed that she and Manuel were not in a relationship.

Paternal grandmother stated that right after B.G. was born, she cared for him every weekend in her home, generally Friday night through Sunday. If B.G. was not with her, then he was with another paternal family member—"either my sisters, brothers or my other son."[5] When B.G. was just over one week old, Kimberly allowed paternal grandmother to take him to visit Manuel in juvenile hall. Paternal grandmother also shopped for B.G.'s diapers. Until his latest arrest, Manuel was doing well. "Before, he was on the streets a lot, but this time around, [Manuel] was staying at home and was trying to take care of getting his [driver's] license and job."

Maternal grandmother stated when B.G. was born in 2018, Manuel was in custody. When he was released, Manuel visited B.G. (presumably at maternal grandmother's home), "maybe for

---

[5] Paternal great aunt confirmed she had B.G. over "once or twice a week" at her home, and paternal grandfather said he would watch B.G. "from time to time" during the week or on weekends at his home. Paternal grandfather and paternal grandmother were separated and did not live together.

5

15 minutes" at a time.  However, following his most recent release from custody, Manuel did not visit B.G.  Maternal grandmother explained that when B.G. was a little older, Kimberly began leaving him with Manuel's family on Fridays so she could be with friends.  At some point, however, Kimberly and Manuel's family had a falling out.  Thereafter, rather than leaving him with Manuel's family, Kimberly began taking B.G. with her "wherever she went."

At the jurisdiction and disposition hearing, the juvenile court took up the issue of Manuel's paternity.  Manuel appeared by video, was represented by counsel, and submitted a Statement Regarding Parentage (form JV 505), which related:  Manuel believed he was B.G.'s presumed father and had "told everyone" that "the child is mine."  Manuel visited B.G. when he was not incarcerated."  Manuel further stated, "The child at one point was with my mother," and "My mother cared for my son."

The juvenile court rejected Manuel's request to be elevated to presumed father status, reasoning he had not established the presumption of Family Code section 7611, subdivision (d).  The court advised the issue of Manuel's parentage status could be revisited at a later date.

2.    **Presumed Father Status**

    A.    *Applicable Law*

"A presumed father is 'one who "promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise. . . ." ' [Citation.]"[6] (*In re E.O.* (2010) 182 Cal.App.4th 722, 726.)  To

---

[6] "There are three types of fathers in juvenile dependency law:  presumed, biological, and alleged.  [Citation.]  A presumed father is a man who meets one or more specified criteria in

6

qualify as a presumed father, Manuel must fall within one of the presumptions of Family Code section 7611. (*In re E.O.*, at pp. 726–727.) The statute's presumption is a "rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (Fam. Code, § 7612, subd. (a).) Subdivision (d) of Family Code section 7611 creates a rebuttable presumption of presumed father status if "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child." (Fam. Code, § 7612, subd. (d).)

> **B.** *Standard of Review*

We apply a substantial evidence standard to our review of the juvenile court's finding presumed father status was not met within the meaning of Family Code section 7611, subdivision (d). (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653.) That is, "we review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found" as decided. (*Id.* at p. 1650.)

---

[Family Code] section 7611. A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father. An alleged father . . . is a man who has not established biological paternity or presumed father status. [Citation.]" (*In re P.A.* (2011) 198 Cal.App.4th 974, 979; accord, *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) "A fourth category, a 'de facto' father, is also recognized in dependency proceedings . . . ." (*In re D.P.* (2015) 240 Cal.App.4th 689, 695, fn. 4.)

7

C. ***There Is Insufficient Evidence of Presumed Father Status***

"In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own ([Fam. Code,] § 7611, subd. (d)), courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental. [Citations.]" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211.)

Manuel and Kimberly were never married and were not living together when B.G. was conceived. Manuel did not help B.G. with prenatal care and was not present for B.G.'s birth. Despite learning he was the biological father, there is no evidence Manuel took steps to put his name on B.G.'s birth certificate or to assume a legal obligation for child support. (*In re Spencer W., supra*, 48 Cal.App.4th at p. 1654 [alleged father "failed to take formal steps to place his name on the birth certificate, to establish paternity by legal action, or to assume the financial obligations for child support"].) Nor is there any evidence Manuel provided financial support for his son's care and daily needs. (*In re A.A.* (2003) 114 Cal.App.4th 771, 786 [biological father who failed to show he financially supported his child is not

8

a presumed father].)  Indeed, Manuel attributed B.G.'s care of his son to paternal grandmother on his Parentage Questionnaire, suggesting whatever care Manuel may have provided was "merely incidental."  (See *In re T.R., supra,* 132 Cal.App.4th at p. 1211.)

Manuel contends he qualified for presumed father status as a matter of law because it was "undisputed" he took B.G. into his paternal grandmother's home, where Manuel lived for at least some of the time between B.G.'s birth and his murder arrest.  We disagree.

To be sure, Family Code section 7611, subdivision (d) does not require a child to live with a parent for a specific period of time (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 373–374, disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532 [no "durational requirement"]) or, even, depending on the circumstances, to live with the parent at all (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 144).  Nonetheless, " ' "[p]arental rights do not spring full-blown from the biological connection between parent and child.  They require relationships more enduring." [Citation.]' [Citation.]" (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160.)  To achieve presumed father status, a man "must be 'someone who has entered into a familial relationship with the child:  someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother." (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.)

Here, the record shows Manuel's involvement with B.G. was inadequate for him to be recognized as B.G.'s presumed father.  First, Manuel lived only intermittently with paternal grandmother.  He was either incarcerated for probation violations

9

and felony vandalism or he was living on the streets. Manuel was in custody when B.G. was born and in juvenile hall the first week of B.G.'s life. Paternal grandmother stated that prior to his most recent release from custody (whenever that was) Manuel "was on the streets." As far as receiving B.G. into paternal grandmother's home when he was there, tellingly, none of Manuel's family members, who spoke extensively about B.G.'s visits, mentioned Manuel as having his son with him at any time. Rather, it was those family members, not Manuel, who received B.G. into their homes. We also note when Kimberly no longer allowed visits with Manuel's family members, there is no evidence that Manuel asked to care for his son. Instead, Kimberly took B.G with her "wherever she went."

Regular visitation or conduct that reflects a father's established parental relationship with the child has been held to satisfy the statutory requirement of receiving the child into the home. (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at pp. 145–148, and cases cited therein.) Manuel's own statements to the Department, however, reflected his minimal commitment to his son. Manuel stated he spent weekends with B.G. and "mostly" visited B.G. on weekends and "sometimes a couple of times during the week." Manuel described the visits as picking up B.G. from maternal grandmother's home and "tak[ing] him out," without indicating the length of the visits or what the two of them did together. Maternal grandmother reported the visits, when they occurred, lasted approximately 15 minutes, although Manuel failed to visit his son following his last release from custody. Both Manual's accounts and maternal grandmother's observations of the visits showed that Manual's contact with his son was sporadic and extremely limited.

10

*In re Cheyenne B.* (2012) 203 Cal.App.4th 1361 is instructive, in which the biological father was incarcerated when his daughter was born and first saw her about one month later when the mother came to see him in prison. (*Id.* at p. 1368.) Upon his release, the father visited his daughter on several occasions and had her visit his home twice. (*Id.* at p. 1380.) The two of them would sometimes meet at a local store when the father, a truck driver, would drive through the town where the daughter lived. (*Id.* at pp. 1369, 1380.) Our colleagues in Division Three held that substantial evidence supported the trial court's ruling that the father's visits with his daughter were not consistent and regular and thus did not meet the requirement that he received his daughter into his home within the meaning of Family Code section 7611, subdivision (d). Such is the case here. The evidence is insufficient that Manuel demonstrated a full commitment to B.G. and B.G.'s well-being to be considered a presumed father under Family Code section 7611, subdivision (d).

**3.    ICWA Facts and Proceedings**

Paternal grandmother stated that she may have Apache and Yaqui ancestry through paternal great grandparents. Paternal grandmother added that no one in her family had registered or participated with the tribes. In his Parental Notification of Indian Status form (ICWA-020 form), Manuel disclosed his possible Yaqui ancestry. As a result, at the June 11, 2020 detention hearing, the juvenile court deferred ICWA findings as to Manuel and ordered the Department to investigate Manuel's possible Indian heritage with both the Apache and Yaqui tribes.

Soon after, in early July 2020, the Department spoke with both Manuel and paternal grandmother. Manuel stated he had

11

no further information concerning his possible Apache and Yaqui ancestry. Paternal grandmother advised the social worker to contact paternal great grandmother. The same day, paternal great grandmother confirmed there was Indian heritage, but told the social worker she had no documentation and the family was not registered with the tribes. Paternal great grandmother "was unable to provide information" as to paternal great grandfather, because the two of them were separated. After sending "a message" to paternal grandmother, the social worker obtained "the information needed" for paternal great grandfather.

On July 16, 2020, the Department sent by certified mail Notices of Child Custody Proceedings for Indian Child (ICWA-030 form) to the Bureau of Indian Affairs, the Secretary of the Interior, the Apache Tribe of Oklahoma, the Fort Sill Apache Tribe of Oklahoma, the Mescalero Apache Tribe, the San Carlos Apache Tribe, the Jicarilla Apache Nation, the Tonto Apache Tribe of Arizona, the White Mountain Apache Tribe, the Yavapai-Apache Nation, and the Pascua Yaqui Tribe.[7]

All the tribes responded that B.G. was not eligible for enrollment in the tribe or was not recognized as a citizen of the tribe.

The juvenile court relied on their responses to find it had no reason to know B.G. was an Indian child as defined by ICWA.

### A.    *Applicable Law*

ICWA seeks "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families" by generating minimum federal standards state courts must follow, except in emergencies, before removing an Indian

---

[7] Copies of these notices are included in the record.

child from his or her family.  (25 U.S.C. § 1902.)  In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene (25 U.S.C. § 1911(c)) and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; see Welf. & Inst. Code, § 224, subd. (e).)  California has imposed additional and more stringent requirements to many aspects of the federal law.  (See Welf. & Inst. Code, §§ 224–224.6.)

An "Indian child" is defined in ICWA as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe, or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4) & (8); see Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

"Under California law, the court and county child welfare department 'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' " (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883; § 224.2, subd. (e).)  As a result of a recent amendment, however, this overarching, ongoing obligation now consists of three distinct duties.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

The first duty, assumed by the Department, arises at the referral stage, when the reporting party is asked whether the child is an Indian child.  (§ 224.2, subd. (a).)  The same inquiry must be of parents and other relatives if the child is taken into temporary custody.  (§§ 307, 224.2, subd. (b).)  For its part, the juvenile court must ask the parties at their first appearance

13

whether they "know[] or ha[ve] reason to know" if the child is an Indian child. (§ 224.2, subd. (c).)

The second duty for the Department or the juvenile court arises if "[t]here is reason to believe a child involved in a proceeding is an Indian child." (§ 224.2, subd. (e)(1).) That threshold is met if "either the parent of the child or the child is a member or may be eligible for membership in and Indian tribe[, which] includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [a child is an Indian child]." (§ 224.2, subd. (e)(1). A "reason to believe" a child is an Indian child triggers the second duty to inquire further to determine whether there is a "reason to know" the child is an Indian child. (§ 224.2, subd. (e)(1).)

The third duty arises if there is a "reason to know . . . that an Indian child is involved," which triggers the third duty to notify the Indian tribes. (Welf. & Inst. Code, § 224.3, subd. (a); 25 U.S.C. § 1912(a).) The Department or the juvenile court has a "reason to know" the child is an Indian child based on one of the statutorily enumerated grounds: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶ (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the

14

child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and/or] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."  (Welf. & Inst. Code, § 224.2, subd. (d).)  "Reason to know" requires the juvenile court to treat the child as an Indian child, until there is evidence from which the court determines to the contrary.  (Welf. & Inst. Code, § 224.2, subd. (i)(1).)

**B.** *Standard of Review*

"When, as is the case here, the facts are undisputed, we review independently whether the requirements of ICWA have been satisfied.  [Citation.]  However, we review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order."  (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)  We look to the ICWA statutes that were in effect at the time of the finding that Manuel is challenging on appeal.  (*Id.* at p. 321.)

**C.** *Limited Remand Is Necessary*

The juvenile court found ICWA did not apply to B.G. during the November 17, 2020 jurisdiction and disposition hearing.  Prior to September 18, 2020, the effective date of the most recent amendment, section 224.2 did not define "reason to believe" in the context of ICWA and its corresponding duty on the juvenile court and the Department.  (Stats. 2020, ch. 104, § 15, eff. Sept. 18, 2020.)  Although not addressed by the Department, we conclude Manuel's and his relatives' specific references to possible Apache and Yaqui heritage were enough to trigger the duty of further inquiry.  (*In re T.G.* (2020) 58 Cal.App.5th 275, 295 [reasonable belief standard interpreted liberally]; accord, *In*

15

*re S.R.* (2021) 64 Cal.App.5th 303, 317, but see *In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 888–889.)

The duty of further inquiry includes interviewing the parents, Indian custodians, and extended family members to gather available familial and tribal enrollment information. (§§ 224.2, subd. (e)(2)(A), 224.3, subd. (a)(5).) The Department "has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) In interviewing the parents and extended family members, the department is to gather the following information:

"(A) The name, birth date, and birthplace of the Indian child, if known[;]

"(B) The name of the Indian tribe in which the child is a member, or may be eligible for membership, if known[; and]

"(C) All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(A)–(C); see § 224.2, subd. (e)(2)(A).)

"Further inquiry" also means contacting the Bureau of Indian Affairs and State Department of Social Services for assistance with identifying tribes in which the child may be a member of or eligible for membership. (§ 224.2, subd. (e)(2)(B).)

Lastly, "further inquiry" includes contacting tribes the child may be affiliated with, and "any other person" who may be

reasonably expected to have information regarding the child's membership, citizenship status or eligibility. (Welf. & Inst. Code, § 224.2, subd. (e)(2)(C).) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.) Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (Welf. & Inst. Code, § 224.2, subd. (e)(2)(C).)

Manuel contends there is insufficient evidence the Department discharged its duty of further inquiry. We agree.

The social worker interviewed Manuel, paternal grandmother and paternal great grandmother about their possible Apache and Yaqui heritage. However, the record fails to disclose the social worker also questioned paternal grandfather and paternal great grandfather about their Indian heritage. Both were living, but were apparently estranged from their respective spouses. The notice form showed the Department had great grandfather's current address. Yet, the Department documented no efforts to contact him to ascertain whether he had membership or enrollment information about himself or any other family members. Only paternal grandfather's name is on the notice, although the Department had contacted him earlier about Kimberly. It is unclear why paternal grandfather's biographical information was not documented. Furthermore, the notice also listed a second set of great grandparents by name only without any biographical information. Whether they were alive

17

and contacted or deceased or otherwise unavailable was not documented.

No statute mandates the Department to document its inquiry. Some decisions, however, acknowledge there is an exception to the "general" rule that an appellant must produce an adequate record demonstrating reversible error because of the unique situation presented by ICWA where a parent acts "as a surrogate for the tribe in raising compliance issues on appeal." (*In re K.R., supra*, 20 Cal.App.5th at pp. 708–709; see, e.g., *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 786–788; *In re N.G.* (2018) 27 Cal.App.5th 474, 484–485.) When the record "does not show what, if any, efforts the agency made to discharge its duty of inquiry" and not all required information was gathered, as is the case here, we cannot presume the department discharged its duty. (See *In re N.G.*, at p. 484.)

The Department's failure to fulfill its duty of further inquiry may have significantly affected the proceedings. The claimed Yaqui and Apache heritage was through the paternal great grandparents. By failing to interview the paternal great grandfather and the other set of paternal great grandparents, the Department failed to obtain information required by sections 224.2 and 224.3 to assist the tribes in determining tribal enrollment or membership. The tribes need biographical information that is accurate and complete in determining whether a child is an Indian child.

We realize that not all the information mandated by sections 224.2 and 224.3 will be obtainable. But we cannot say the Department adequately satisfied its duty of further inquiry in the absence of documentation showing their efforts to gather the necessary information for the tribes.

Limited remand is necessary, at a minimum to allow the Department the opportunity to make a record of its efforts to contact extended family members and/or gather the requisite information of sections 224.2 and 224.3. If the Department needs to contact additional individuals and to conduct further investigation to discover previously unknown information, new inquiries shall be made to the relevant tribes with the newly discovered information.

We do not reach Manuel's argument that the notice was deficient because the ICWA-030 form was outdated or incomplete. The record does not support a finding that any one of the six "reasons to know" grounds enumerated in section 224.2, subdivision (d) was present. No one informed the court that B.G. was an Indian child; neither B.G. nor his parents lived on a reservation or in an Alaska Native village; no one informed the court that it had discovered information indicating B.G. was an Indian child; B.G. did not give the court reason to know he was an Indian child; B.G. never was or had been a ward of a tribal court; there was no evidence Kimberly or Manuel possessed an identification card indicating membership or citizenship in an Indian tribe. (See § 224.2, subd. (d)(1)–(6).) Thus, the duty to give notice to the tribes was not triggered and Manuel's argument is premature. We have considered the contents of the ICWA-030 form the Department used solely as evidence of an attempt to fulfill its duty of further inquiry and not as evidence of defective notice.

## DISPOSITION

The juvenile court's order removing B.G. from parental custody is conditionally reversed. The matter is remanded to the juvenile court to enable the Los Angeles County Department of Children and Family Services to conduct an adequate inquiry as required by Welfare and Institutions Code sections 224.2 and 224.3 and any additional proceedings that may result. If the court finds (1) adequate inquiry has been made consistent with the reasoning of this opinion, and (2) the Indian Child Welfare Act of 1978 (ICWA) applies, the court shall proceed in conformity with ICWA and related California statutes. If the court finds ICWA does not apply, the removal order shall be reinstated.

**NOT TO BE PUBLISHED.**

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

20