Filed 10/5/22  I.M. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| I.M.,     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,     Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY, et al.,     Real Parties in Interest. | A165786<br><br>(San Francisco City & County Super. Ct. No. JD21-3234) |

Minor's biological father filed a petition for extraordinary relief from the juvenile court's order setting a permanency planning hearing under Welfare and Institutions Code[1] section 366.26.  Father argues he was denied due process when the agency failed to exercise diligent efforts to locate and serve him with adequate notice of the proceedings, and the trial court abused its discretion when it denied his request to elevate his paternity status from biological father to presumed father at a critical stage of the proceedings.  We deny the petition.

---

[1] All statutory references are to the Welfare and Institutions Code.

1

# I.  FACTUAL AND PROCEDURAL BACKGROUND

On October 20, 2021, the San Francisco Human Services Agency filed a petition under section 300, subdivisions (b) and (g) alleging minor, I.M., was at risk due to mother's mental health issues, serious neglect, homelessness, and neglect of the child's medical needs.  When the petition was filed, mother's location was unknown and father's identity and location were unknown.

According to the detention report, I.M. had come to the agency's attention through a report that mother had abandoned her apartment in Vallejo, was living in her car with baby I.M, and after the car was towed, was riding the bus all night with I.M.  Relatives were concerned that mother was selling her food stamps instead of buying food for herself and the child and was experiencing postpartum depression and not responding to I.M.'s needs.  I.M. was left with relatives at times, who reported she was very hungry when left in their care.

In early October 2021, mother left I.M. with a relative in Sacramento.  Maternal grandmother, A.W. (grandmother), was going to pick I.M. up and bring her back to San Francisco.  Before she could pick up I.M., however, mother took her back.  A few days later, mother's former boyfriend took mother and I.M. to the hospital because I.M. had a cough and they were concerned she might have a respiratory infection.  Mother left the hospital with I.M. against medical advice and was seen walking outside with no place to go.  Grandmother filed a missing persons report.  When the police located mother, she was uncooperative and they had no reason to detain her.  Eventually, an Agency social worker convinced mother to leave I.M. with grandmother.

The Agency obtained a removal warrant after it was unsuccessful in making further contact with mother to further assess the situation and put a plan in place. The detention report contained no information about father, stating only that paternity was "Pending information."

Neither parent appeared at the detention hearing on October 22, 2021. The court provisionally appointed counsel for mother, who could not be reached. The court made temporary detention findings, ordered I.M. detained, and set the matter for a "J-1" hearing. Mother did not appear at the "J-1" hearing on November 4, 2021, and could not be located.[2] The court scheduled a settlement conference for December.

On November 18, 2021, the Agency filed declarations of due diligence regarding its search for mother and father. According to the declarations, grandmother did not know mother's phone number or whereabouts. As to father, the declaration stated the social worker had located I.M.'s birth verification letter and no father was listed on the letter. The social worker also spoke with grandmother, who told the social worker that she knows I.M.'s father but refused to disclose his name because he is "a 'violent pimp' " and she did not want him in I.M.'s life.

The jurisdiction and disposition report filed the next month recommended I.M. be declared a dependent of the court. According to the report, the Agency asked grandmother and a cousin about the identity of the alleged father and conducted "a long search for the unknown father." Grandmother told the social worker that she did not know the name of I.M.'s father or his whereabouts. Father's identity remained unknown and no

---

[2] At a later hearing, mother's counsel reported that mother showed up at court on the day of the J-1 hearing, but arrived late.

3

services were recommended for father.  Mother remained transient and had not come forward since I.M. had been detained.

Before the jurisdiction and disposition hearing in January 2022, the Agency filed an Addendum Report.  Mother had been located because she had been hit by a car and was hospitalized in Sacramento.  Mother was transferred to medical facilities in Sonoma County for rehabilitation, but she was a difficult patient and refused treatment while in the facilities.  When contacted by the social worker, mother said she did not understand why she had an open CPS case and said that her family had agreed to care for I.M. for three months while mother got " 'back on her feet.' "  As to father, the report noted that his identity and ability to care for the child were unknown at the time.  On December 8, 2021, mother told the agency that she wanted father and his family to have a relationship with I.M.  On December 10, she told the social worker she did not know father's name, and she did not have any contact information for him.  Mother reported father "was a one-night stand and she had met him in Sacramento."

In January, counsel for the parties, but neither parent, appeared for a contested jurisdiction and disposition hearing.  The juvenile court found reasonable efforts had been made to locate the alleged father and his "identity as well as his ability to care for the child are unknown at this time."  The juvenile court sustained the petition and declared I.M. a dependent of the court, to be placed with grandmother.  The court required mother to present herself for assessment by the Agency prior to receiving reunification services and supervised visitation.

In June, the Agency filed a report for the six-month status review.  According to the report, father had contacted the agency on February 21 and 22, 2022, identifying himself as the father of I.M. and requesting a call back

4

from the social worker. On February 22, father spoke with the social worker and told her that he was I.M.'s father and that he wanted to assume custody of his child. A DNA testing referral was submitted on February 24, and father was tested on March 24. On May 31, the Agency filed a DNA test report which showed a 99.99998% probability that father was I.M.'s biological father.

When the social worker interviewed father, he told her he met mother on Facebook and met in person on several occasions. He lost contact with mother in April 2021. His mother, N.H., had been in contact with mother and I.M. when father was incarcerated. Father reported that mother had been evading him and "has not allowed contact with minor without becoming aggressive or combative." Father had a visit with I.M. with grandmother's support on February 25, 2022. Father disclosed to the Agency that he had a criminal history including incarceration in 2018, which is why he was denied contact with I.M. He reported he was on parole and wore an ankle monitor. Father consented to the Agency obtaining his DOJ clearance and RAP sheet for assessment. The social worker was unable to meet with mother because her whereabouts were unknown to her family and the Agency.

At a hearing on June 29, 2022, father appeared by phone and was appointed counsel. The court elevated his status to biological father.

Through counsel, father requested visits with I.M. and expressed interest in having the minor placed with him. Counsel said that father had come forward as the child's father in December 2020, and then contacted the Agency in this case in February 2022 as the potential father. Counsel reserved "any and all objections" regarding notice issues. The court gave the Agency discretion to arrange supervised visits for father once the social worker had a chance to meet with him.

5

On July 12, 2022, at the six-month status review hearing, father appeared in person. While in court, father completed a JV-505 Statement of Parentage,[3] in which he indicated that I.M. had visited his home in December 2020 and March 2021. Father wrote that the first time he saw I.M., he took her home with him for three days and took care of her. In March 2021 she was in his home for two days. Father told grandmother and his immediate family that I.M. was his child. He purchased gifts, diapers, clothes, formula, a car seat, toys, and shoes for her after she was born and drove everything to I.M.'s aunt's house in Sacramento. (*Id.* at p. 3 of 4 [JV-505])~ His mother, N.H., and his little sister had met the child twice. Father wrote that he had been "trying [to] be there for [I.M.]" for the past two years, and grandmother and mother had always known that he was the father but had been keeping I.M. from him.

At the hearing, father told the court that I.M. had never lived with him but had visits for "a week, three days, a couple of days." He said he had only seen I.M. three or four times and "every other time [he] would drive to see them in Sacramento." When I.M. stayed with him, father was responsible for taking care of her, but mother did not stay with them.

Father was not present at the child's birth because he was incarcerated at the time. When asked whether his name was on the birth certificate, father answered that I.M. has his last name, but when he went down to vital records he was told he was not on the birth certificate. He noted that mother gave the child his last name but claimed she did not know who the father was. Asked if he had ever been married to mother, father said, "I don't know her like that." When asked if he had ever lived with mother, father said he

---

[3] Counsel for the other parties and the social worker had not seen the JV-505 yet.

6

had only "seen her once in my life." Father said he met mother in June 2019 and his daughter was born approximately nine months later. Father had not signed a voluntary declaration of paternity.

Father's counsel asked that father's status be elevated to presumed parent based on the fact that he had received the child into his own home and held the child out as his own. Counsel noted father would have been more involved in the case, but mother and grandmother misrepresented to the Agency that they did not know who he was. Counsel for the Agency and I.M. objected to any finding until they had an opportunity to review the JV-505. At the end of the hearing, the court found good cause to continue the six-month review hearing. The court announced it would "finalize [father's] legal status in the case" at the next hearing.

On August 2, 2022, the parties appeared for the continued six-month review hearing. Father appeared remotely.

Father's counsel again asked the court to elevate his paternity status based on his JV-505 declaration which had been filed and provided to the court and all parties. Counsel argued that father had satisfied all necessary elements of Family Code section 7611, subdivision (d), because he received the child into his home, spent time caring for her when allowed by mother, provided financial support for her, and wished to be recognized as the presumed father. Counsel indicated if father were elevated to presumed father, it was anticipated he would file a JV-180 to request reunification services. Counsel requested the matter be put over "a month" to allow visits to happen.

The judge apologized and said he had not read father's JV-505 because he thought that the prior judge had already ruled on the paternity issue. Counsel for the agency noted he had not seen "a motion to seek to elevate"

7

father and requested that the court go forward with the Agency's recommendation to set the section 366.26 hearing and terminate reunification services with respect to mother. The court then asked father's counsel if she would be able to get her paperwork in before the November 30 permanency planning hearing date. Father's counsel responded, "Absolutely, your Honor," and said if she needed to file a motion to request presumed father status she would be "happy to do that."

At the conclusion of the hearing, the court ruled that "because the young person is two years of age, I am going to continue to have the case move forward." The court indicated it would read the JV-505 and would "hear a formal request to elevate [father] to presumed status, but I am not prepared to do it today."

The court found notice had been given as required by law, and the conditions still existed that would justify the initial assumption of jurisdiction. The court found by clear and convincing evidence that reasonable services had been provided but that mother had failed to make any progress, and that the return of the child to the mother would create a substantial risk of detriment. The court terminated mother's reunification services and set the matter for a section 366.26 hearing on November 30, 2022. Father's counsel told the court she would "be filing that paternity motion forthwith."

## II. DISCUSSION

### A. *Notice*

Father first contends he was denied due process because he was not given adequate notice of the proceedings. Father argues the trial court erred in finding that reasonable efforts were made to give him proper notice because his identity was known to both mother and grandmother, and the

8

Agency failed to exercise diligence in attempting to locate him and serve him with notice of the proceedings.

We conclude father forfeited his claim that he did not receive proper notice by failing to object in the trial court. Although father's counsel "reserved" objections with respect to notice when she was first appointed, she never asserted an objection, including at the six-month review hearing when the court found notice had been given as required by law. When asked if she had "anything else on behalf of [father] at the conclusion of the six-month review hearing, father's counsel said "No, your honor. I will be filing that paternity motion forthwith."

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) Indeed, while appellate courts have discretion to excuse such forfeiture, they should do so "rarely and only in cases presenting an important legal issue." (*Ibid.*) This is especially true in juvenile dependency cases, which involve the well-being of children and in which "considerations such as permanency and stability are of paramount importance." (*Ibid.*)

"A defect in notice . . . is a most serious issue, potentially jeopardizing the integrity of the entire judicial process. However, when a parent had the opportunity to present that issue to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal. This is precisely because defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court." (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 [even

9

though juvenile court erred in proceeding with unscheduled jurisdictional hearing that had not been properly noticed, parent forfeited error on appeal by appearing at subsequent hearings and failing to object in juvenile court].) By failing to assert an objection to inadequate notice in the juvenile court, father forfeited this claim on appeal.

## B.  *Presumed Father Status*

Father next asserts that the juvenile court abused its discretion when it declined to elevate him to presumed father status, and contends having a legally recognized father is in the child's best interest.

We first note that father's characterization of the juvenile court's orders is somewhat misleading.  The record reflects that the juvenile court has not yet ruled on father's presumed parent status, but has stated it "will hear" the request and required father to present a written motion.  Father has not offered any authority or argument that the decision to require "further information via written motion" was an abuse of discretion.  For the reasons we discuss below, we conclude it was not.

Dependency law accords different paternity rights to a man depending upon his paternity designation.  Of relevance to this case are the "presumed" and "biological" father designations.  A presumed father is one who satisfies any of the conditions set forth in Family Code section 7611.  Generally speaking, "[a] man who has neither legally married nor attempted to legally marry the mother of his child becomes a 'presumed father' under subdivision (d) of Family Code section 7611 if he both ' "receives the child into his home *and* openly holds out the child as his natural child." ' "  (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1228)  The advantage of being a child's presumed father is that it entitles the father to reunification services under section 361.5, subdivision (a) and custody of his child under section 361.2.  (*In re Zacharia*

10

*D.* (1993) 6 Cal.4th 435, 451.) Father bears the burden of establishing, by a preponderance of the evidence, the facts showing he a presumed father. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653 (*Spencer W.*).)

In contrast to the presumed father, a biological father is one whose biological paternity has been established, but who has not achieved presumed father status. (*In re Zacharia D., supra,* 6 Cal.4th at p. 449, fn. 15.) The biological father is not entitled to reunification services but the juvenile court may order them for him if the court determines that the services will benefit the child. (§ 361.5, subd. (a).)

Father asserts he met the necessary elements of Family Code section 7611, subdivision (d) because the "unrebutted evidence" in the record demonstrates he came forward after his child was born, and when he was released from custody, he received the child in his home on multiple occasions when permitted by mother, and he held the child out as his own.

The question of how to prove that a man has "receiv[ed] a child into his or her home" and "openly [held] out the child" as his own to qualify as a presumed father under Family Code section 7611, subdivision (d), is a complex one. While a father does not need to receive the child into his home for a specific period of time, he must demonstrate a parental relationship, however imperfect. (*Jason P. v. Danielle S.* (2017) 9 Cal.App.5th 1000, 1023.) "There are no specific factors that a trial court must consider before it determines that a parent has 'received' a child into the home and has established a parental relationship. 'In determining whether a man has "receiv[ed] a child into his home and openly h[eld] out the child" as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expense commensurate with his ability to do so; whether he promptly took

legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether the father provided for the child after the child no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental.' " (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 145–146.)

"No single factor is determinative; rather, the court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774.) "Presumed parent status is afforded only to a person with a *fully developed parental relationship* with the child . . . ." (*Id.* at p. 776.)

Here, the superior court did not abuse its discretion by asking counsel to file a written motion supporting his request to be elevated to presumed parent status. Father submitted a JV-505 form that lacked significant information as to most of the factors supporting presumed father status. Father's responses did not explain when father first learned of the pregnancy or whether he provided any support to mother during her pregnancy. Indeed, father told the juvenile court he had only "seen [mother] once in my life." Father said he met mother in June 2019 and his daughter was born approximately nine months later, suggesting he had little to no involvement in supporting mother during pregnancy. Although the record indicates father was incarcerated when I.M. was born, father presented no facts as to when he

12

was released or what steps he took to resume custody and care for the child upon his release.

The court could have denied father's application based on the lack of information presented, but instead asked for a written motion to elevate father's status. Father's counsel agreed to provide one. In light of the insufficiency of the JV-505 form in providing facts supporting presumed father status, the juvenile court's decision to require a written motion was not an abuse of discretion.

In any event, even if the court erred in declining to rule on father's request to be elevated to presumed father, the error was harmless because based on the limited information presented on the JV-505 form and father's responses to the juvenile court's questions at the July 12 hearing, he has not shown it is reasonably probable that the juvenile court would have found him a presumed father. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1122–1123 [failure to provide father JV-505 form was harmless error where father could not meet statutory elements to be declared presumed father].) As noted above, father bears the burden of demonstrating his presumed father status by a preponderance of the evidence. (*Spencer W., supra,* 48 Cal.App.4th at p. 1653.)

While father bought presents, formula, clothes, and a car seat for I.M. and drove them to her aunt's house in Sacramento when the baby was born, he did not show ongoing, or indeed any other, financial contribution to the child's rearing. (See, e.g., *Spencer W., supra,* 48 Cal.App.4th at pp. 1652–1654 [evidence father lived with child and mother was not enough where mother provided all financial support].) On his JV-505 form he wrote that he told his immediate family members and grandmother that I.M. was his child, but he offered no facts to demonstrate he took any legal action to assume

13

custody. (See, e.g., *Spencer W.,* at p. 1654 [telling relatives and friends that child was his was insufficient in absence of legal action to assert parental rights and assume parental obligations].)

Father also wrote that he took care of I.M. in his home for three days in December 2020 (just after she was born) and for two days in March of 2021.[4] However, "the child's physical presence within the alleged father's home is, by itself, insufficient" under section 7611, subdivision (d) to constitute " 'receipt of the child into [the father's] home . . . .' " (*W.T. v. S.T., supra,* 20 Cal.App.5th at p. 145; see, e.g., *In re Cheyenne B.* (2012) 203 Cal.App.4th 1361, 1380 [evidence father was incarcerated when child was born, visited her several times, and child stayed at his home twice was insufficient to satisfy requirement he received child in his home]; *In re A.A.* (2003) 114 Cal.App.4th 771, 786 [evidence that alleged father lived with minor for one to three months was "exceedingly small" period of time]; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [evidence father lived with child in his home for "at most" 11 days was insufficient to establish fatherhood].) Rather, the record must reflect substantial evidence of an "established" and "fully developed parental relationship." (*R.M. v. T.A., supra,* 233 Cal.App.4th at pp. 780–781.) Here, in the absence of additional information about the nature and regularity of visits with I.M. and his efforts to care for and provide for the child, the bare statement father took care of I.M. for three days shortly after her birth and two more days three months later is the kind of temporary, incidental care insufficient to established presumed father status.

---

[4] Even crediting father's vague statement at the July 12 hearing that he had visits with I.M. of a "a week, three days, a couple of days," father explained in the same response that "[i]t was *only three or four times that I seen her* and every other time I would drive to see them in Sacramento . . . ." (Italics added.)

Father also cites briefly to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) and *In re Zacharia D.* (1993) 6 Cal.4th 435, to argue that our Supreme Court has recognized a father seeking to become a presumed father does not have exclusive control over the means to achieve that status. "A biological father may be accorded parental rights and become a *Kelsey S.* father when his attempt to achieve presumed parent status under section 7611, subdivision (d) is thwarted by a third party and he made 'a full commitment to his parental responsibilities—emotional, financial, and otherwise.' " (*In re Elijah V.*, *supra*, 127 Cal.App.4th at p. 583.) Because father did not argue in the juvenile court his status as a *Kelsey S.* father, however, the argument is forfeited on appeal. (*Id.* at p. 582 [if man seeking *Kelsey S.* status does not expressly raise that issue in juvenile court, it is forfeited at appellate level even if other parentage issues have been preserved].)

In any event, even assuming the trial court erred in not considering whether father was a *Kelsey S.* father, we likewise would conclude the information included on the JV-505 form and his responses to the juvenile court's questions were insufficient to demonstrate a "full commitment to his parental responsibilities—emotional, financial, and otherwise" within the meaning of *Kelsey S. (Kelsey S.,* 1 Cal.4th at p. 849.) According to the social worker's report, father was incarcerated at the time I.M. was born. Father was not on the birth certificate, and he did not complete a voluntary declaration of paternity. Father stated he lost contact with mother in April 2021 and she disappeared for nine months. Although he said mother was evading him, he also said his mother and other relatives stayed in contact with mother and grandmother. Father provided no facts in his JV-505 or to the court to explain how he was able to have I.M. visit him if he was denied

15

contact, and he did not explain what mother or other relatives had done to prevent him from assuming his parental responsibilities, or what steps he had taken to seek custody of I.M. at any time since her birth. (*Kelsey S., supra,* 1 Cal.4th at p. 849.) In sum, the responses on the JV-505, even when combined with father's statements at the six-month review hearing, were insufficient to establish his status as a presumed father under Family Code section 7611, subdivision (d) or a *Kelsey S.* father.

On this scant record, father has not shown it is more likely than not the juvenile court would have found him a presumed father, and thus any error in requiring a written motion was harmless. We express no opinion, however, on how the trial court should rule on any such motion or parentage request in future.

## III. DISPOSITION

The petition is denied on the merits. Because the permanency planning hearing in this matter is set for November 30, 2022, this opinion is final as to this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) Father's request for a stay of the permanency planning hearing is denied as moot.

_____

Margulies, J.


WE CONCUR:


_____

Humes, P. J.


_____

Devine, J.*


A165786


_____

\* Judge of the Superior Court of Contra Costa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.