Filed 2/8/24  In re Jacob H. CA2/8

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JACOB H., a Person Coming Under the Juvenile Court Law. | B327825 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DANY H., Defendant and Appellant. | Los Angeles County Super. Ct. No. 22CCJP03920C |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen C. Marpet, Commissioner.  Conditionally affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

————————————

Dany H., the biological father of Jacob H., appeals the juvenile court's determinations that (a) Dany is not entitled to presumed father status; and (b) there was no reason to know Jacob is an Indian child within the meaning of the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.). We review each question for substantial evidence. The record does not compel the conclusion that Dany is Jacob's presumed father. And we find no error in the juvenile court's preliminary determination—made prior to its jurisdictional and dispositional orders—that there was no reason to know Jacob is an Indian child. However, since the court and the Los Angeles County Department of Children and Family Services (the Department) each recognize their continuing inquiry duties under ICWA, we conditionally affirm with instructions to continue to fulfill ICWA obligations.

## BACKGROUND

This case began in October 2022, when Jacob was five. It was precipitated by Dany murdering Jacob's mother's boyfriend and then absconding with Jacob after picking him up from school under a fictitious name. Dany was later found walking the streets with Jacob at 1:00 a.m. Jacob was detained. Dany was arrested. Dany has been in state custody ever since.

### 1. Background Relevant to Parentage

Before Dany murdered mother's boyfriend, it is unclear how much time Jacob spent with Dany. Only a small amount of time is established in the record. Jacob lived with Dany at Dany's siblings' house or houses for a month or two before the murder. This was because he had just been released from jail in August 2022, and mother's substance abuse had rendered her unable to care for Jacob and her two other children by a different

2

father.  For some time before Dany was released from jail, Jacob stayed with maternal grandmother or in a motel with mother.

The parties do not tell us how long Dany was in jail prior to his August 2022 release.  At some point—again, we do not know when—he spent about a year on the lam in Mexico while wanted in California for receiving stolen property.  Dany offers that he at least lived with mother while she was pregnant with Jacob.

At the juvenile court arraignment hearing in November 2022, Dany's counsel represented that Jacob lived with Dany since October 2021 and that Dany had always provided for Jacob and held him out as his own child to family and friends.  Dany filed a signed Form JV-505 regarding parentage the same day to the same effect.  He also asserted that he participated in "home & school activities" with Jacob, and Jacob spent holidays and birthdays with Dany's family.  In that filing, Dany acknowledged he had not previously established parentage—neither by a voluntary declaration nor court judgment—and requested a finding of presumed fatherhood.  On the basis of these representations, the court stated, "[s]ounds like he's a presumed father for this child.  [¶]  We'll make [Dany] a presumed father."

But some of the representations that formed the basis for that ruling were false.  Jacob could not have lived with Dany from October 2021 through October 2022 because Dany was released from jail in August 2022.  Dany and mother both stated Jacob had lived with Dany for just a month or two before the murder.  Mother did confirm Dany provided some material support for Jacob.  And it is true that Dany was known to Jacob's school.  Both he and mother had instructed the school not to release Jacob to the other, but neither ever provided the school

3

any legal documents or custody orders showing a restriction against the other parent.

On its own initiative, after discovering that Jacob's birth certificate did not identify Dany as his father, the juvenile court notified the parties it would reconsider whether Dany was a presumed father. At Dany's counsel's request, the court continued the matter so counsel could prepare for the hearing.

About a month later, Dany's counsel offered the following argument as to why Dany should be a presumed father: "although [Dany] was not married to the mother, not on the birth certificate, he has lived with the child. He's lived with him for a few months in October of 2021. I believe prior to this incident, he was living with the child and enrolled the child in school. He was involved in the child's schooling. In the report the principal knew of [Dany]. He has been around and has a relationship with Jacob." She continued, "[h]e indicated in the report he was paying mother's rent for some time so he has a relationship. I don't understand why he would not be presumed."

The juvenile court rejected these arguments because Dany "had never taken the child into his home . . . ." It explained, "[h]e may have lived with the child with mother but that's different than taking the child into his home. He's not on the birth certificate. They weren't living together at conception or birth. And he has never taken the child into his home. For a couple of months he might have lived with mother but that's it."

Dany's counsel did not dispute this characterization of the facts. Rather, she responded "[t]hat was his home at the time, Your Honor." After the juvenile court found Dany was merely a "bio-alleged father" and not a "presumed father," Dany's counsel asked the court to reconsider: "I would just like to restate my

4

request for presumed status, under Family [Code] section 7611(d), [Dany] has held himself openly as the father and held him in his home, even if he shared that home with the mother. We're again asking for presumed status." Notably, Dany's trial counsel abandoned any contention that Dany had lived with Jacob in a home that was not mother's or that, as Dany's appellate counsel repeatedly and incorrectly claims, Dany "took exclusive custody of Jacob since October 2021 until the child's detention from [Dany] in October 2022 . . . ."

## 2. Facts Relevant to ICWA

Mother and Dany each filed a Form ICWA-020 denying Indian heritage. The Department separately inquired with mother, Dany, and maternal grandmother about possible Indian heritage. Each denied any such heritage, and Dany described his family as being of Mexican, rather than American Indian, descent. The Department did not inquire with any paternal relatives, despite at least one paternal aunt living locally and having been identified as a potential monitor for telephonic visits between Dany and Jacob. Dany lived with this or another paternal aunt or uncle before being arrested for murder, and the Department had Dany's last known address. Thus, the Department had contact information for at least one paternal aunt or uncle with whom it had not, as of the commencement of this appeal, inquired about Indian heritage.

The juvenile court found it had no reason to know Jacob was an Indian child, as defined under ICWA, both after father filed his ICWA-020 form and after mother filed her ICWA-020 form. Each of these findings was made before the court entered its jurisdictional and dispositional orders.

5

## DISCUSSION

### 1. Parentage Finding

Dany challenges the juvenile court's decision to deem him a biological and alleged father rather than a presumed father. The Department contends he forfeited his constitutional challenges to that action by failing to raise them below, and we agree. (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9 ["[a]ll issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it"].) We find his other arguments to be without merit.

First, we reject Dany's contention that the juvenile court committed reversible error by failing to comply with its duty of inquiry imposed under California Rules of Court, rule 5.635(d) and (e). Dany argues the juvenile court erred in failing to order the clerk to prepare and submit a parentage inquiry to the local child support agency to determine whether parentage of Jacob had been established. Cognizant that such an error is subject to harmless error analysis (see *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1123 [applying harmless error analysis to purported violation of rule 1413 (now rule 5.635)]), Dany contends error was prejudicial because he "declared on his JV-505 parentage form that there was a previous parentage finding through genetic testing 'DNA' and he paid mother for the child's care, likely showing that parentage and child support may have already been established." Not so. Dany's JV-505 form did say he "want[ed] the court to know" "[p]ositive DNA test," but it also provided parentage *had not* been established—neither by a voluntary declaration nor court judgment—and requested a finding of

6

presumed fatherhood. Because there was no parentage order or declaration to be discovered, there was no prejudice.

Second, we are unpersuaded that the juvenile court erred in concluding the record failed to establish Dany was Jacob's presumed father under subdivision (d) of Family Code section 7611. It is undisputed that Dany does not qualify as a presumed father under any of the other section 7611 grounds because he and mother never married, Dany was not named on Jacob's birth certificate, and Dany had no formalized support obligation to Jacob. (See *id.*, subds. (a)-(c).)

To qualify as a presumed father under Family Code section 7611, subdivision (d), a father must "receive[] the child into [his] home and openly hold[] out the child as [his] natural child." (*Ibid.*) Receipt of the child and holding the child out as kin are two separate requirements. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 ["a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he *both* 'receives the child into his home *and* openly holds out the child as his natural child.' "].) "A person requesting presumed parent status under section 7611, subdivision (d) must have a 'fully developed parental relationship' with the child." (*In re M.Z.* (2016) 5 Cal.App.5th 53, 63.)

"There are no specific factors that a trial court must consider before it determines that a parent has 'received' a child into the home and has established a parental relationship." (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 145.) " '[C]ourts have looked to such factors as whether the [alleged father] actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he

7

promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental.' " (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.)

"While the juvenile court may consider a wide range of factors in making a presumed parent determination, as appropriate to the circumstances [citation], the core issues are the person's established relationship with and demonstrated commitment to the child." (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 485.) The burden is on the person seeking presumed parent status to demonstrate the foundational facts giving rise to the presumption. (*R.M. v. T.A* (2015) 233 Cal.App.4th 760, 774.)

We review the juvenile court's rejection of Dany's claim to presumed father status under Family Code section 7611, subdivision (d) for substantial evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1653.) Because Dany had the burden of proof in the juvenile court, this standard of review requires Dany to demonstrate the evidence below compelled a finding in his favor as a matter of law. (See, e.g., *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.) In assessing his position, we consider "whether [his] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517,

1528, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.)

The record does not compel the conclusion that Dany is Jacob's presumed father. Dany first claims the record "abundantly showed [he] lived with mother when she was pregnant with Jacob, and after they separated, [Dany] tried to marry mother by giving her an engagement ring and paid mother's rent and gave her money for Jacob's care." Most of these facts are based exclusively on statements Dany made to the Department and the Department recited in a report. In the same report, the Department noted Dany's lack of credibility and denial of facts that were well established by other witnesses (e.g., that Dany once shot at a car that had cut him off while driving with Jacob and mother). Accordingly, the juvenile court was free to disbelieve Dany's reported statements to the Department. As to Dany's financial support, the court might reasonably have attributed it to serving Dany's own interests rather than his interest in being a parent to Jacob. (Cf. *In re Spencer W., supra,* 48 Cal.App.4th at p. 1653 [the father's cohabitation with the mother and the child at the mother's home not demonstrative of commitment to the child given other interests the father had in the arrangement].) Dany acknowledged financially supporting mother was something he did to help mother "get better." Similarly, his decision to care for Jacob between Dany's stints in state custody related, in Dany's telling, to mother's substance abuse issues.

Dany goes on to claim he "took exclusive custody of Jacob since October 2021 until the child's detention from [him] in October 2022, a period of time when mother succumbed to her drug use and voluntarily relinquished Jacob's physical custody to

[Dany].” As already noted, Dany claimed this in his JV-505 form but contradicted it in other statements to the Department. He admitted he was in custody for at least some of this time as he was incarcerated at least during August 2022 and the record does not disclose how long he was held in custody before his release in August 2022.

Ultimately, the breadth of factors the juvenile court was entitled to consider, the limited time Dany cared for Jacob, and the lack of clarity as to whether that took place at Dany's home, mother's home, or the home of a sibling of Dany's, we cannot say that the record compels the conclusion that Dany received Jacob into his home. As such, we need not consider whether Dany also held Jacob out as his child.

## 2.    ICWA Inquiry

In involuntary state court proceedings concerning child custody, such as these dependency proceedings, ICWA requires notice to the relevant Indian tribe "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a).) It is incumbent upon the court administering such a proceeding to inquire whether the subject child is an Indian child. The scope of the duty on the court, as well as certain participants in the proceeding (including county welfare departments, like the Department), is defined by federal regulations and related state law. (See, e.g., 25 C.F.R. § 23.107 (2023); Welf. & Inst. Code, § 224.2; Cal. Rules of Court, rule 5.481.)

"The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (a).) The court and county welfare department "have an

10

affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child. (§ 224.2, subd. (a).)

Dany claims error under Welfare and Institutions Code section 224.2, subdivision (b), which obligates the Department to ask certain persons related to the proceedings about the child's possible Indian ancestry. (See § 224.2, subds. (a), (b), (c); *In re S.S.* (2022) 75 Cal.App.5th 575, 581; *In re D.F.* (2020) 55 Cal.App.5th 558, 566.) As relevant to Dany's appeal, these persons include the child's statutorily defined "extended family members." (Welf. & Inst. Code, § 224.2, subds. (b), (d); see also 25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).) While the duty to inquire of extended family members lies with the county welfare department, a juvenile court's finding that the ICWA does not apply implies that (a) neither the department nor the court had a reason to know or believe the child was an Indian child; and (b) the department fulfilled its duty of inquiry. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) We review such findings for substantial evidence. (*Ibid.*)

This appeal was taken when the case was in its early stages. The order appealed was the juvenile court's jurisdictional and dispositional order. "[A]n ICWA appeal at the jurisdiction and disposition stage" is premature "where there will necessarily be further dependency proceedings in the juvenile court (at which continuing ICWA duties apply)" and a basis for later appeal if for some reason the Department fails to fulfill its continuing duty of inquiry. (See *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638.)

Although the juvenile court twice found no reason to know Jacob was an Indian child after receiving the parents' respective ICWA-020 forms, it also recognized the inquiry was ongoing. The

11

minute orders summarizing its findings included an admonition to the parents to keep the court and Department apprised of any new information relating to possible ICWA status. The court remains obligated to change its finding of no reason to know Jacob is an Indian child if new information comes to light. (*In re S.H.* (2022) 82 Cal.App.5th 166, 176.) Likewise, the Department acknowledges that it has "an ongoing duty to comply with the ICWA and the opportunity to conduct further inquiry of extended paternal family members." We expect the Department will fulfill its duty of inquiring with all available extended family members as the case progresses, if it has not done so already.

We therefore conditionally affirm the court's orders. Should it become known, or should there be reason to know, that Jacob is an Indian child, the notice requirement will be activated, and the relevant tribes will need to be notified. The jurisdictional and dispositional findings do not need to be reversed to direct the court and the Department "to do something they recognize they must do anyway." (*In re S.H., supra*, 82 Cal.App.5th at p. 177.)

## DISPOSITION

The juvenile court's finding with respect to Dany's paternity and preliminary findings with respect to Jacob's Indian heritage are conditionally affirmed subject to the Department and the court continuing to fulfill their ICWA obligations.


GRIMES, Acting P. J.


WE CONCUR:


WILEY, J.          VIRAMONTES, J.


12